**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X

HITACHI DATA SYSTEMS CREDIT
CORPORATION,

           Plaintiff/Counterclaim-Defendant,

          v.

PRECISION DISCOVERY, INC., a New York
corporation, f/k/a PRECISION DISCOVERY, LLC,

          Defendant/Counterclaim-Plaintiff.

-------------------------------------------------------------- X

PRECISION DISCOVERY, INC., f/k/a
PRECISION DISCOVERY, LLC,

          Third-Party Plaintiff,

          v.

HITACHI DATA SYSTEMS and COLD CREEK
SOLUTIONS, INC.,

          Third-Party Defendants.

-------------------------------------------------------------- X

Civil Case No.: 17-cv-06851 (SHS)

**DEFENDANT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS IN RESPONSE TO PLAINTIFF'S COMPLAINT AND
AMENDED THIRD-PARTY COMPLAINT AGAINST HITACHI DATA SYSTEMS
AND COLD CREEK SOLUTIONS, INC.**

      Defendant Precision Discovery, Inc. f/k/a Precision Discovery, LLC ("Precision

Discovery" or "Defendant"), appearing specially and without waiver of jurisdictional defenses,

by its attorneys, Wigdor LLP, submits this Answer and Statement of Counterclaims in response

to the Complaint filed by Plaintiff Hitachi Data Systems Credit Corporation ("Plaintiff" or

"HDSCC") by stating as follows:[1]

---

[1]      On March 19, 2018, the Court granted Precision Discovery leave to file the instant amended pleading. *See*
Exhibit 1.

## PARTIES, JURISDICTION AND VENUE

1.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 1 of the Complaint.

2.     Defendant admits the allegations in Paragraph 2 of the Complaint.

3.     Defendant denies the allegations in Paragraph 3 of the Complaint except admits that Plaintiff purports to invoke venue in New York State as alleged therein and further refers the Court to the document in question for the truth and full contents therein.

4.     Defendant denies the allegations in Paragraph 4 of the Complaint except admits that Plaintiff purports to invoke the Court's jurisdiction as alleged therein.

## FACTS COMMON TO THE CAUSE OF ACTION

5.     Defendant denies the allegations in Paragraph 5 of the Complaint and refers the Court to the document in question for the truth and full contents therein.

6.     Defendant denies the allegations in Paragraph 6 of the Complaint and refers the Court to the document in question for the truth and full contents therein.

7.     Defendant denies the allegations in Paragraph 7 of the Complaint and refers the Court to the document in question for the truth and full contents therein.

8.     Defendant denies the allegations in Paragraph 8 of the Complaint and refers the Court to the document in question for the truth and full contents therein.

9.     Defendant denies the allegations in Paragraph 9 of the Complaint and refers the Court to the document in question for the truth and full contents therein.

10.     Defendant denies the allegations in Paragraph 10 of the Complaint.

11.     Defendant denies the allegations in Paragraph 11 of the Complaint.

12. Defendant denies the allegations in Paragraph 12 of the Complaint and refers the Court to the document in question for the truth and full contents therein.

13. Defendant denies the allegations in Paragraph 13 of the Complaint and refers the Court to the document in question for the truth and full contents therein.

## FIRST CAUSE OF ACTION
## (Breach of Contract)

14. Defendant repeats and realleges its responses to Paragraphs 1-13 as if fully set forth herein.

15. Defendant denies the allegations in Paragraph 15 of the Complaint and further states that Paragraph 15 sets forth legal conclusions for which no response is required.

16. Defendant denies the allegations in Paragraph 16 of the Complaint and refers the Court to the document in question for the truth and full contents therein.

17. The allegations in Paragraph 17 of the Complaint set forth a legal conclusion for which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 17 of the Complaint.

18. Defendant admits the allegations in Paragraph 18 of the Complaint.

19. The allegations in Paragraph 19 of the Complaint set forth a legal conclusion for which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 19 of the Complaint.

## GENERAL DENIAL

Defendant denies each and every allegation in the Complaint not specifically admitted herein.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The allegations alleged in the Complaint fail to properly state, specify or allege a cause of action for which relief can be granted as a matter of law.

### SECOND AFFIRMATIVE DEFENSE

To the extent that Plaintiff incurred any damages, which Defendant denies, its claims are barred because Plaintiff failed to mitigate its alleged damages.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's damages, if any, resulted from the acts or omissions of other persons or entities over which Defendant had no control.  The acts of such persons or entities constitute intervening or superseding causes of harm, if any, suffered by Plaintiff, and Defendant is not responsible, in law or in fact, for any such alleged harm.

### FOURTH AFFIRMATIVE DEFENSE

Any damage, loss or liability sustained by Plaintiff must be reduced, diminished and/or barred in proportion to the wrongful or negligent conduct of persons or entities other than Defendant under the principles of equitable allocation, recoupment, set-off, proportionate responsibility and comparative fault.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed because they are barred by the doctrines of unclean hands, estoppel, waiver or other equitable defenses.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed because the agreement it seeks to enforce is unenforceable as it was unconscionable.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed because Plaintiff fraudulently induced Defendant to enter into the agreement it now seeks to enforce.

## EIGHTH AFFIRMATIVE DEFENSE

The relief sought by Plaintiff is barred, in whole or in part, because the alleged damages sought are too speculative and uncertain.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's alleged losses were proximately caused by its own decisions and conduct and not by any acts or omissions by Defendant.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed because the agreement it seeks to enforce was procured by fraud in fact.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed because the agreement it seeks to enforce is the result of a mutual mistake.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed because Plaintiff failed to perform under the terms of the agreement it now seeks to enforce.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed because Plaintiff breached the implied warranty of fitness for a particular purpose.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed because Plaintiff breached the implied warranty of merchantability.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed because Plaintiff breached the implied warranty of good faith and fair dealing.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed because no enforceable contract ever came into existence.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed because Plaintiff lacks standing to pursue the relief it seeks in this action.

## NINETEENTH AFFIRMATIVE DEFENSE

Because no discovery has been taken at this stage of the case, Defendant reserves its right to file and serve additional affirmative defenses.

## DEFENDANT'S PRAYER FOR RELIEF

Defendant denies the allegations and requested relief set forth in Plaintiff's Prayer for Relief, and further denies that Plaintiff is entitled to any relief whatsoever.

**WHEREFORE**, having answered and responded to the allegations in the Complaint, Defendant respectfully requests that:

(a)     Plaintiff's claims be dismissed with prejudice in their entirety;

(b)     Each and every prayer for relief contained in the Complaint be denied;

(c)     Judgment be entered in favor of Defendant as to all claims in the Complaint;

(d)     All costs, including, but not limited to, reasonable attorneys' fees, be awarded to Defendant and against Plaintiff pursuant to applicable laws; and

(e)     The Court grant Defendant other and further relief as the Court may deem just and proper.

## AMENDED COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Defendant/Counterclaim-Plaintiff/Third-Party Plaintiff Precision Discovery, Inc., f/k/a Precision Discovery, LLC ("Precision Discovery," the "Company" or "Counterclaim-Plaintiff"), by its undersigned attorneys, Wigdor LLP, hereby alleges and asserts its counterclaims against Plaintiff/Counterclaim-Defendant Hitachi Data Systems Credit Corporation ("HDSCC") and Third-Party Defendants Hitachi Data Systems ("HDS," and together with HDSCC, "Hitachi") and Cold Creek Solutions, Inc. ("Cold Creek"),[2] and states as follows:

## NATURE OF COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1.     Beginning in approximately January 2012, HDSCC and its authorized resellers, including Cold Creek, began leasing IT infrastructure equipment and data storage hardware, software and related services to Precision Discovery pursuant to the terms of an agreement between the parties.

2.     However, following certain questionable business transactions discovered in mid-2017, including a fraudulent and deceptive agreement that would have effectively required Precision Discovery to cease its core business operations, Precision Discovery retained independent forensic accountants to conduct an extensive review of all prior equipment leases into which Precision Discovery had entered with HDSCC.

3.     As a result of their investigation, Precision Discovery's forensic accountants determined that, over the prior six years, HDSCC had overcharged Precision Discovery by

---

[2]     HDSCC, HDS and Cold Creek are hereinafter collectively referred to as "Counterclaim-Defendants."

approximately $2.5 million dollars.  Given the manner in which HDSCC designed various schedules to the parties' agreement, the overpayments were extremely difficult to detect, as they were the result of HDSCC's business practice of rolling Precision Discovery's existing leases into new leases, and then overcharging Precision Discovery large amounts on equipment that was actually included in the prior leases.  Counterclaim-Defendants also knowingly leased to Precision Discovery equipment that was already obsolete, duplicative, did not fulfill its intended function and was in fact unusable and completely unsuitable for Precision Discovery's business, all while charging enormously marked-up rates under the applicable lease.

4.      When Precision Discovery conducted a further investigation to determine how HDSCC could have successfully overcharged it for millions of dollars, it was shocked to learn that Counterclaim-Defendants were abetted in their scheme to defraud by one of Precision Discovery's own employees.  The head of IT for Precision Discovery at the time, Howard Holton, who was responsible for negotiating the agreements for the IT equipment financed by HDSCC and leased by HDS and Cold Creek, had received tens of thousands of dollars from Counterclaim-Defendants in the form of both cash and "gifts."

5.      Essentially, Counterclaim-Defendants had successfully worked together to bribe their primary contact person within the Company into accepting a deal that was both a clear conflict of interest and against Precision Discovery's interests and all ethical and legal standards, all for the purpose of tricking the Company into paying Counterclaim-Defendants large sums of money to which they had no legitimate right.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over Precision Discovery's counterclaim pursuant to 28 U.S.C. §§ 1332(a)(1) and (a)(3), as the parties are citizens of different states and the amount

in controversy is in excess of $75,000.  Additionally or alternatively, this Court has jurisdiction over Precision Discovery's counterclaim, as it is a compulsory counterclaim pursuant to Fed. R. Civ. P. 13(a), which logically arises from the same transaction or occurrence as HDSCC's claim against Precision Discovery.

7.      This Court has personal jurisdiction over HDSCC because it has availed itself of the rights and privileges of this forum by bringing this civil action in this judicial district.

8.      Venue for Precision Discovery's counterclaim is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this counterclaim occurred in this district.

9.      This Court has jurisdiction over Precision Discovery's third-party claims against Cold Creek and HDS pursuant to 28 U.S.C. §§ 1332(a)(1) and (a)(3), as the parties are citizens of different states and the amount in controversy is in excess of $75,000.  Additionally or alternatively, this Court has jurisdiction over Precision Discovery's third-party claims pursuant to 28 U.S.C. § 1367, as the third-party claims arise from the same transaction or occurrence or common nucleus of operative facts as HDSCC's claims against Precision Discovery.

10.     This Court has personal jurisdiction over HDS and Cold Creek because they have availed themselves of the rights and privileges of this forum by conducting business in the state of New York.

11.     Venue for Precision Discovery's third-party claim is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to these third-party claims occurred in this district.

## FACTS

**Parties**

12.     Precision Discovery is a New York corporation with its principal place of business located in New York, New York.  Precision Discovery is a premier national eDiscovery service provider, and, as such, provides its clients with data processing, hosting and storage, as well as other services related to client data.  Precision Discovery's Colorado-based data center was responsible for supporting Precision Discovery's nationwide operations, including its New York-based headquarters.

13.     HDSCC is a Delaware corporation with its principal place of business located in Santa Clara, California, and is a wholly owned subsidiary of Hitachi Ltd.  HDSCC is engaged in the business of providing intermediate or long-term general and industrial credit.

14.     HDS is a Delaware corporation with its principal place of business in Santa Clara, California, and is a wholly owned subsidiary of Hitachi Ltd.  HDS provides mid-range and high-end computer data storage systems, software and services.

15.     As alleged herein, HDS, as well as HDSCC and Cold Creek, prepared and/or negotiated the terms of Schedule J to the Lease Agreement with knowledge that Precision Discovery's primary business operations and administration are located in New York.

16.     To that end, HDS routinely prepared and sent Precision Discovery quotes for Hitachi equipment to be leased to Precision pursuant to schedules to the Lease Agreement.

17.     Moreover, Precision Discovery made payments under Schedule J to the Lease Agreement – the terms of which Precision Discovery negotiated with HDS and Cold Creek – from its headquarters located in New York.

18.     Upon information and belief, HDS conducts extensive business in the state of New York, including maintaining an office located at 101 Park Avenue, 10th Floor, New York, NY 10178.

19.     Moreover, HDS is an entity registered to conduct business in the state of New York.

20.     In an April 23, 2014 news release, HDS boasted that, "[w]ith over 6,400 employees worldwide, Hitachi Data Systems does business in more than 100 countries and regions.  Our products, services and solutions are trusted by the world's leading enterprises, including more than 70% of the Fortune 100 and more than 80% of the Fortune Global 100."

21.     In that same news release, Precision Discovery's Director of Information Technology, Howard Holton, was quoted as saying that certain new HDS equipment would "potentially save [Precision Discovery] a considerable amount of money by only upgrading [its] hardware when needed for the foreseeable future."   Holton further stated that Precision Discovery was "able to cut processing time significantly, and return that time, and the related costs, back to [Precision's] customers."

22.     HDS was aware that the effects of the tortious acts described herein would affect Precision's business operations located in New York.

23.     Cold Creek is a Colorado corporation with its principal place of business located in Greenwood Village, Colorado.  Cold Creek is an IT products and services provider, and is an authorized HDS equipment reseller.

24.     As alleged herein, Cold Creek, acting along with HDS and HDSCC, was closely involved in setting the terms of Schedule J to the Lease Agreement with Precision Discovery, which Cold Creek knew was headquartered in New York.

25.     Beginning in approximately January 2014, Paul Schwappach and Adam Lancaster of Cold Creek began to communicate with Precision Discovery in an effort to develop a business relationship with Precision Discovery.

26.     Thereafter, Cold Creek stayed in close contact with Precision Discovery, sending countless emails regarding equipment and services that it would lease and provide to Precision Discovery.

27.     Indeed, in a March 14, 2016 email, Holton referred to Cold Creek as Precision Discovery's "main vendor," and stated that Cold Creek "[w]orks with [H]itachi mostly."

28.     Accordingly, Cold Creek routinely sent Precision Discovery quotes for equipment, as well as invoices for equipment that Cold Creek leased to Precision Discovery. These invoices were paid from Precision Discovery's headquarters located in New York.

29.     Relevant here, Cold Creek routinely communicated with Precision Discovery regarding equipment leased pursuant to the terms of the Lease Agreement in this action and the various schedules thereto.

30.     By way of example only, in a March 23, 2015 letter from HDSCC to Precision Discovery, HDSCC is identified as the lessor of certain equipment under the Lease Agreement, Precision Discovery is identified as the lessee and Cold Creek is identified as the reseller.

31.     Furthermore, as described below, Cold Creek and Precision Discovery exchanged many emails regarding the equipment to be leased under Schedule J to the Lease Agreement.

32.     Upon information and belief, at all times while communicating with Precision Discovery, Cold Creek was aware that its operations were headquartered in New York and that Precision Discovery's Colorado-based data center was responsible for supporting Precision's nationwide operations.

33.     Accordingly, Cold Creek was aware that the effects of its tortious acts described herein would affect Precision's business operations located in New York, and that Cold Creek was availing itself of business transactions occurring in New York.

**The Lease Agreement**

34.     On or about January 13, 2012, Precision Discovery and HDSCC (the Hitachi finance company that HDS utilized) entered into Lease Agreement Number 11MFS1227 (the "Lease Agreement") governing lease transactions between HDSCC (as lessor) and Precision Discovery (as lessee).

35.     The specific equipment and services that HDSCC leased to Precision Discovery pursuant to the terms of the Lease Agreement were identified in accompanying schedules, which the parties negotiated and executed from time to time, beginning in or around January 2012.

36.     To that end, acting in concert with and on behalf of HDSCC, both HDS and Cold Creek were intimately involved in negotiating the subsequent schedules to the Lease Agreement.

37.     As a result of the Lease Agreement and the related schedules, nearly all of Precision Discovery's IT infrastructure and data storage equipment in its Denver, Colorado data center consist of HDS hardware and software, and HDS engineers were critical to helping build Precision Discovery's primary data center.

38.     At all relevant times, HDS and Cold Creek were involved with the negotiation of the hardware and software that HDSCC would lease to Precision Discovery pursuant to the terms of the Lease Agreement.

39.     Therefore, both HDS and Cold Creek had intricate and detailed knowledge of Precision Discovery's IT infrastructure and data storage needs.

40.    By way of example only, HDS Field Engineer Mike Johnson and HDS Sales Engineer Robert Munoz had full access to the HDS Command Suite 8 software that Precision Discovery utilized and knew that Precision Discovery had 2.38 petabytes[3] ("PB") of data storage.

41.    Likewise, on or about February 2, 2015, HDS Master Strategic Initiatives Consultant Scott Davis wrote to a potential HDS client stating that Precision Discovery had approximately 2.5PB of HDS data storage equipment.

42.    The IT infrastructure and data storage hardware that Precision Discovery leased from HDSCC pursuant to Schedules A through I to the Lease Agreement provided for sufficient data storage for Precision Discovery's business operations and data storage needs.

43.    However, and despite having direct knowledge of Precision Discovery's IT infrastructure and data storage needs, beginning in June 2016, HDS and Cold Creek secretly worked with a Precision Discovery employee to deceptively and fraudulently induce the Company into agreeing to a new schedule, Schedule J, to the Lease Agreement ("Schedule J"), which Counterclaim-Defendants were aware was grossly insufficient and unsuitable for handling the Company's data storage needs.

**Howard Holton's Double-Dealing Relationship with Hitachi and Cold Creek**

44.    HDS and Cold Creek were only successful in their efforts to fraudulently induce Precision Discovery into such a confiscatory and, ultimately, illegal transaction by surreptitiously entering into an improper arrangement with Precision Discovery's Chief Information Officer, Howard Holton ("Holton").   This relationship created obvious, irreconcilable and irrevocable conflicts of interests that made any transactions entered into by or

---

[3]    One petabyte of data is equal to 1,000 terabytes ("TB") of data or 1,000,000 gigabytes ("GB") of data.

through these individuals and entities with or on behalf of Precision Discovery inherently improper, unenforceable and fraudulent.

45.     It has been uncovered that Hitachi's and Cold Creek's unethical and unlawful conduct against Precision Discovery was not limited to the single instance of the Schedule J transaction, but instead was part of a multi-year scheme to systematically overcharge and defraud Precision Discovery under their various leases and business arrangements.

46.     Specifically, unbeknownst to the management of Precision Discovery, while Holton was ostensibly employed as the head of Precision Discovery's IT department, he was simultaneously engaged and receiving income as a contractor and/or consultant for Cold Creek.

47.     A former Cold Creek employee admitted to Precision Discovery that Cold Creek in fact had business cards made for Holton, but that Holton did not use the Cold Creek business cards because he did not like their quality.

48.     In addition to Holton's inappropriate contracting and consulting work for Cold Creek, HDS employees sought to work with Holton and other individuals on a new business venture while Holton was still employed by Precision Discovery.

49.     On February 27, 2017, Chris Barringer, a Services Sales Representative for HDS, sent an email to Holton and other individuals within HDS, stating that they were "forming a company" for the purpose of "collaborating business, app, social, [and] public enhancement . . . ." Barringer wrote that the new company would "take those ideas and determine which ones are actionable, have real potential, and work towards making them a reality."

50.     In a second email sent later the same afternoon, Barringer informed the group that Holton would draft a non-disclosure agreement in order to protect the new company's ideas that

were shared within the group, and would research the best way to legally structure the new company.

51.     Tellingly, shortly after Barringer's second email to the group, Holton requested that Barringer stop communicating with him via his Precision Discovery email address, writing, "Can you change my email for this to [Holton's personal account]."

52.     In addition to Holton's inappropriate business relationship with HDS and Cold Creek, all while Holton remained a Precision Discovery employee, HDS and its authorized reseller Cold Creek provided Holton with large and facially improper financial benefits and gifts, including luxury executive suite tickets to sporting events, sports memorabilia and expensive liquor, amounting to tens of thousands of dollars of handouts, to which Precision Discovery remained ignorant at all times.

53.     By way of example only, on September 8, 2016, HDS gave Holton two luxury executive suite tickets to attend the Denver Broncos' opening day game against the Carolina Panthers.

54.     On September 9, 2016, Holton emailed a contact at HDS to request four more luxury suite tickets to see the Broncos play the Kansas City Chiefs over the Thanksgiving holiday weekend.  HDS's Rocky Mountain Regional Sales Manager, Steve Shattuck, contacted another HDS employee, writing, "Lorann, could [you] put Howard down for four [tickets] for KC?"  Within four minutes, HDS Account Representative Billy Metting responded to Shattuck and Holton, stating, "I already have [Holton] down for KC."  *See* Ex. 2.[4]

55.     At Holton's request, HDS also provided Holton with two luxury box tickets in the Citrix Owners' Club Suite for the San Francisco 49ers game against the New York Jets in San Francisco on December 11, 2016.

---

[4]     Citations to "Ex." refer to exhibits annexed hereto.

56.     In addition to the numerous sporting event tickets HDS gave Holton, Cold Creek also provided Holton with an excessive number of gifts in the form of meals and entertainment, including, but not limited to, celebrity bowling events with the Denver Broncos, high-end events at the Denver Zoo, golf outings, expensive shooting events and lavish meals.

57.     It is therefore abundantly clear that HDS and Cold Creek were attempting to buy Holton's loyalty and cooperation, thereby acquiring a corrupted, disloyal agent within Precision Discovery that would make any arm's length transaction between the parties an impossibility.

58.     To be clear, Holton's inappropriately close relationship with HDS involved individuals who took part in the transaction and leases at issue in this action, and not just various other employees and agents of HDS and Cold Creek.  Indeed, Holton maintained an unusually close personal relationship with HDS's Billy Metting—the very individual from HDS with whom Holton negotiated the sham Schedule J transaction.

59.     On September 8, 2015, Metting sent Holton an email asking if Holton was "still thinking about looking at [Metting's] Toyota Tacoma."  Holton responded that he was "very much" still interested and requested photographs of the truck.  *See* Ex. 3.  The following is merely one more example of the type of inappropriate side financial transactions and handouts that occurred and/or were discussed between Metting and Holton.

60.     Although the exact date on which Metting provided Holton with his truck is unclear, on October 20, 2015, Metting sent Holton an email with the subject, "Don't rob any banks or do any drive bys in my truck."  In a separate email sent the same day, Metting further wrote, "Do[n't] give it back to me with blood on it either.  Wash it."  Shortly thereafter, Holton responded, simply stating, "Not giving it back.  We should talk and work something out."  *See* Ex. 4.

61.     On October 26, 2015, Metting asked Holton, "What are you think[ing]?  $3,000 or 460 and $2,500."  *Id.*  The "460" Metting referenced referred to Holton's model 460 handgun. Metting immediately sent a second email to Holton in which he stated, "How about $3,000 and I will throw in some Packers tickets?"  Two minutes later, Holton responded to Metting, stating, "I was thinking $2,500.  If you want the 460 you are in trouble.  It is worth well more than $1000 and you would have to take the ammo as well, since I don't have any need for it without the pistol."  The following day, Metting responded, "$2,500 is good . . . ."  *See* Ex. 5.

62.     Although Metting and Holton had agreed on the sale of Metting's personal truck, Holton continued to try to sell Metting his firearms.  In an October 27, 2015 email to Metting, Holton wrote, "I did not mean to scare you off the 460, and I have other firearms if you are interested."  Metting responded, "I love how you say 'Firearms,'" to which Holton responded, "I'm crazy [E]ddie!"  *Id.*

63.     In a December 2, 2015 email, Metting and Holton finalized the sale of Metting's truck to Holton.  Metting wrote, "Can you bring $2,500 for the truck to lunch Friday? I have the title in my car."  Approximately one hour later, Holton responded, "Will do."  *See* Ex. 6.

64.     Thereafter, HDS and Cold Creek leveraged the gifts and close personal relationship with Holton and seized upon the opportunity to fraudulently induce Precision Discovery into agreeing to Schedule J, thereby allowing HDSCC and Cold Creek to charge exorbitant rental fees for nearly obsolete and entirely inappropriate data storage hardware.

65.     Indeed, after the execution of the sham Schedule J transaction, Cold Creek's President accompanied Holton and his wife on a shopping spree during which Holton purchased approximately $10,000 in high-end alcohol at Cold Creek's expense.

**Schedule J and the G1000 Equipment Transaction**

66.     On June 10, 2016, Cold Creek sent Holton an initial quote for the hardware, software and related services that HDSCC would lease to Precision Discovery pursuant to Schedule J.

67.     The only data storage hardware included in the June 10, 2016 quote was a G1000 Virtual Storage Platform (the "G1000 Equipment"), which provided for 1.188PB of total data storage, of which, only approximately 783TB was usable.

68.     Given Precision Discovery's already existing 2.38PB of data stored across all HDSCC-leased equipment, the G1000 Equipment was unquestionably insufficient for Precision Discovery's ongoing data storage needs, and only provided a fraction of the data storage that Precision Discovery required to even maintain its then-current operations.

69.     Precision Discovery uncovered evidence that HDS and Cold Creek never intended to migrate the data from Precision Discovery's existing hardware to the G1000 Equipment, proving that this was a sham transaction, with no benefit intended for Precision Discovery.

70.     Importantly, Precision Discovery has discovered an extremely revealing email exchange between Holton and Metting that was initiated by Metting on May 24, 2016.  This email was sent by Metting 18 days before Cold Creek even sent its first quote for the G1000 to Holton.

71.     Metting's email stated: "Do you need migration services for the move from the HUSvm's/HUS150 to the new G100[0]?  Thanks."  However, Holton then revealed the bogus nature of the G1000 transaction (specifically, that the equipment was never meant for use, but was purely cover for adding enormous additional charges to Precision Discovery) when he responded with "No.  Installation only."  *See* Ex. 7.

72.     This email exchange demonstrates that Hitachi and its disloyal Precision Discovery employee partner knew that a 2.38PB data storage environment could not be migrated onto a different, outmoded one with only 1.421PB.   Counterclaim-Defendants intended to offload the unsuitable G1000 Equipment onto Precision Discovery, knowing that it could not be used for the Company's core eDiscovery business, which is exactly what has happened as the G1000 Equipment continues to sit unused and useless in a corner of Precision Discovery's facilities.

73.     Cold Creek's initial quote on the lease was for an aggregate total of $1,800,000.00, of which $652,700.46 was attributable to the G1000 Equipment hardware, with the remainder being purportedly for the purposes of the G1000 Equipment software, support and services.

74.     As a clear indication that Counterclaim-Defendants were offering the transaction in bad faith and simply as a means of defrauding Precision Discovery, the initial quote also included two Brocade switches, which, with associated costs for installation and maintenance, added an additional $64,630.30 to the cost of Schedule J to the Company.

75.     Both HDS and Cold Creek were aware that these Brocade switches were unnecessary, as, pursuant to Schedules A through I to the Lease Agreement, Precision Discovery already had a large inventory of switches in its possession that would work with the G1000 Equipment.   This was a transparent running up of costs by Counterclaim-Defendants at the expense of Precision Discovery with the full cooperation of Holton as a disloyal employee.

76.     Furthermore, another email provides further evidence of Counterclaim-Defendants' fraudulent intent and overcharging behind the G1000 transaction, in which the President of Cold Creek wrote to Metting on June 8, 2016, stating, "Long and short, I want to

increase the size of this June sale with a refresh of all their brocade equipment.  If this can be done, it could be fairly lucrative (I think).  See what you can do.  Let me know how I can help."

77.     Recognizing that the initial quote could not possibly be sufficient for Precision Discovery's data storage needs, upon receiving Schedule J, Holton requested hardware with additional data storage capacity in order to handle the Company's existing data storage needs, and the potential to expand to account for additional data storage needs in the future.

78.     On or about June 27, 2016, Cold Creek sent Holton a second quote for the hardware, software and related services that HDSCC would lease to Precision Discovery pursuant to Schedule J.

79.     The June 27, 2016 quote provided for just 20% more data storage, for a total of 930.64TB of total usable capacity, still far short of Precision Discovery's actual needs.

80.     Thus, despite having direct knowledge of Precision Discovery's IT infrastructure and data storage needs, and specifically being asked to provide equipment sufficient to meet those needs, both of Cold Creek's quotes provided for a fraction of the data storage hardware that the Company required.

81.     Incredibly, and despite this fact, on September 9, 2016, Holton executed Schedule J on behalf of Precision Discovery.

82.     Schedule J had an effective date of October 1, 2016, and a term of forty-eight months.

83.     Pursuant to the terms of Schedule J, Precision Discovery was required to pay monthly rent of $103,500.00, with monthly taxes of $4,398.75, for an aggregate monthly total of $104,898.75.

84.     Thus, the total value of Schedule J was $5,035,140.00.

85.     A straightforward examination of Schedule J reveals that, of the $5,035,140.00 of payments Precision Discovery would be saddled with over the life of the lease, more than $4,000,000 of it was comprised of "phantom profits" for HDSCC.  This lease, which posed as an IT data storage overhaul, was therefore a textbook fraudulent transaction.

86.     Schedule J would have effectively required that Precision Discovery cease its core business operations or submit to additional exorbitant charges to maintain its current systems as well, as the G1000 Equipment was already considered obsolete at HDS and its storage capacity was insufficient to meet Precision Discovery's data storage needs, of which both HDS and Cold Creek were fully aware.

87.     This scheme is revealed by the coercive terms of the lease itself, as Schedule J further required that Precision Discovery return all previously leased hardware and software by March 31, 2017 or pay an additional $20,000.00 per month in rent to retain the data storage hardware identified in Schedules G through I to the Lease Agreement (as they knew their customer Precision Discovery would be forced to do because to the G1000 Equipment's unsuitability as a replacement for the current systems and equipment).

88.     Therefore, unless it paid this $20,000 effective ransom, Precision Discovery's only remaining data storage hardware would be the inadequate, obsolete G1000 Equipment provided for at an inflated cost in Schedule J.

89.     In addition to leaving Precision Discovery with too little storage capacity for its business operation needs, Counterclaim-Defendants knew that the G1000 Equipment was a nearly obsolete piece of equipment unsuitable for Precision Discovery's core eDiscovery needs.

90.     The G1000 Equipment had an original release date of April 23, 2014, and HDS itself had published on its website in October 2016 that the technology should be upgraded to the G1500.

91.     By taking advantage of the disloyalty that Hitachi and Cold Creek had unethically purchased from one of Precision Discovery's most senior employees, Counterclaim-Defendants fraudulently induced the Company to enter into Schedule J, which was unsuitable for Precision Discovery's business needs, was used to mask vast overcharges on various HDS equipment and which deceptively pawned off nearly obsolete data storage hardware at grossly inflated prices.

**Falsified Installation Certificate and Invalid Lease**

92.     Pursuant to the terms of the Lease Agreement, Precision Discovery was required to execute an Installation Certificate on the date the equipment was properly and completely installed, in accordance with the standards set forth by HDS's Professional Services Group. Crucially, HDSCC was not legally entitled to receive any lease payments under Schedule J without first obtaining a signed (and legitimate) Installation Certificate from Precision Discovery.

93.     On September 8, 2016, Metting sent Precision Discovery a copy of both Schedule J and an Installation Certificate for Precision Discovery to sign.

94.     At this point, the G1000 Equipment had not even been shipped to Precision Discovery, yet Hitachi was already soliciting Holton to fraudulently sign the Installation Certificate.

95.     Crucially, Hitachi would not release large monetary payments to Cold Creek or the HDS sales team on the transaction until the Installation Certificate was signed.

96.     On September 9, 2016, Holton, on behalf of Precision Discovery, returned an executed copy of Schedule J to HDS, but, because the equipment listed on Schedule J had not yet been installed, Precision Discovery was unable to execute or return the Installation Certificate.

97.     Although Holton sent the executed Schedule J to Metting at HDS, on September 9, 2016, Schwappach of Cold Creek responded to Holton, stating "This is awesome! Thank you very much for the business.  Now making sure it goes smooth from my end.  Congratulations on your purchase."

98.     Moreover, shortly after Holton returned the executed Schedule J, he contacted Precision Discovery's CEO, Jerry Barbanel, in New York, writing, "Please have the check cut for first (current) and last lease payment ASAP and let me know the tracking or wire information so I can get it to [H]itachi.  They won't ship until that happens."

99.     In a September 20, 2016 email, Cold Creek's President informed Holton that the G1000 Equipment was not even scheduled to ship (to say nothing of being installed) until that day.  Specifically, Cold Creek's Paul Schwappach wrote, "Looks like the G1000 will ship today!!! I'll let you know when the shipping is confirmed." *See* Ex. 8.

100.    Despite being fully aware of the fact the equipment had not yet shipped, much less been installed, at Precision Discovery, that same afternoon, before confirming that the G1000 Equipment had even been shipped to Precision Discovery, Schwappach sent Holton another email stating, in effect, that the HDS and Cold Creek sales team would not receive their commissions until the Company returned the completed Installation Certificate and pressuring Holton to therefore return the executed certificate.

101.    In so doing, Cold Creek, on behalf of itself and HDS, once again exercised its unethical and unlawful control over Holton, which they had corruptly bought and paid for, by

pushing him to return a false and fraudulently executed Installation Certificate that falsely stated that the G1000 Equipment had been installed, when it had had not even been ***shipped and delivered***.

102.    On September 21, 2016, Holton complied with Schwappach's fraudulent request, returning a falsified installation certificate, stating:

> (1) the Equipment listed [on Schedule J] has been:  (a) inspected by authorized representatives of Lessee; and (b) accepted by Lessee for leasing under the Lease and has become subject to and governed by the provisions of the Lease; (2) Lessee is obligated to pay Rent and all other sums provided for in the Lease with respect to the Equipment; (3) the Installation Date is 9/22/2016; and (4) an authorized officer of Lessee has executed this Acceptance Certificate.

103.    Hitachi's auditors also could easily have identified a major "red flag," as their own documentation indicated that a major piece of data center equipment had somehow miraculously been properly and fully installed at a client on the same day that it was shipped and delivered.  Even more damning with regard to the obvious fraudulent intent and falsity of the proposition that the equipment was part of a proper transaction is the fact that Holton signed the installation document with the date of September 21, 2016, yet falsely indicated that the installation happened one day later, on September 22, 2016.  The installation very obviously could not have been witnessed a day before it supposedly happened (the equipment was in fact never installed).  If Hitachi's auditors had uncovered this major "red flag," it could have avoided first badgering for payment, and then bringing litigation against, a longstanding client that did in fact pay hundreds of thousands of dollars under a falsified and fraudulent lease.

104.    In reality, and as Counterclaim-Defendants were aware, the G1000 Equipment remained unplugged and was not moved to Precision Discovery's private cage in Precision Discovery's data center for 48 days until November 8, 2016.

105.    In fact, even the partial basic installation for the G1000 Equipment did not happen until on or around **January 9, 2017**.

106.    To date, Hitachi has never properly completed the full installation of the G1000 Equipment, and the G1000 Equipment has never been used by Precision Discovery for its core business operations.

**Hitachi's and Cold Creek's Fraud and Deceptive Practices are Revealed**

107.    On November 2, 2016, HDS Project Manager Sarah Reynolds sent an email to Holton, Jason Piper and David Tran of Precision Discovery, in which she made clear the consequences to the Company of adhering to Schedule J.  Specifically, Reynolds wrote that "All the equipment on the attached leases is due back 3/31/2017 as per the new lease.  Once that is back, the only equipment that will be on the lease is (2) VSP G1000 HW 1,412,000 GB (333-4TB; 50-1.6TB) & SW; (1) HCP SW; and (2) BROCADE G620."  *See* Ex. 9.

108.    Reynolds's email confirmed that, pursuant to Schedule J, Precision Discovery's eDiscovery operations could be forced to cease as of March 31, 2017, as:  (1) HDSCC was requiring Precision Discovery to return all of the computing equipment the Company had previously leased; (2) HDSCC was requiring Precision Discovery to return all of its 2.38PB of data storage across all of its then-existing HDS equipment; and (3) the only HDS equipment that Precision Discovery would retain was the G1000 Equipment, which did not even have enough data storage to handle Precision Discovery's existing client data storage needs.

109.    In an effort to head off the concern that was growing within his team about lacking sufficient equipment to continue their operations, Holton sent an email to Piper and Tran in which he stated, "Ignore this for now.  More information forthcoming."  *See* Ex. 10.

**Holton's Termination and Precision Discovery's Investigation**

110.   Ultimately, Holton was terminated as the head of Precision Discovery's IT department on March 27, 2017.

111.   The Company first learned of the questionable nature of Schedule J and the G1000 Equipment transaction after Holton's termination.  Accordingly, the Company retained independent forensic accountants to conduct an investigation regarding Schedule J, the G1000 Equipment transaction and all prior schedules to the Lease Agreement.

112.   As a result of its investigation, Precision Discovery learned that HDSCC, HDS and Cold Creek, with the assistance of Holton, had perpetrated a scheme to defraud Precision Discovery into making approximately $2.5 million in overpayments over the prior six years.

113.   Given the parties' longstanding and close business relationship, rather than commencing an action for fraud against HDSCC and HDS, Precision Discovery opted to serve as a whistleblower and informed HDS's general counsel that there were serious ethical and legal issues surrounding both Schedule J and prior schedules to the Lease Agreement.  Indeed, Precision Discovery informed HDS's legal and compliance departments in writing that it was in the midst of an investigation which it expected to complete on or around September 15, 2017.

114.   Rather than taking appropriate measures in response and conducting its own investigation of the unethical and illegal conduct of Hitachi's employees and those of its authorized Hitachi reseller, HDSCC commenced the instant retaliatory action against Precision Discovery on September 8, 2017 in a transparent tactic to somehow beat Precision Discovery to the punch, preempt its findings and retaliate against Precision Discovery for exposing Hitachi's employees' unlawful and unethical conduct.  Regrettably, HDSCC's action has forced Precision

Discovery to bring the instant claims, and Counterclaim-Defendants continue to attempt to force collection and payments on their fraudulently induced leases with Precision Discovery.

## FIRST COUNTERCLAIM AND THIRD-PARTY CLAIM
### (Fraudulent Inducement against HDSCC, HDS and Cold Creek)

115.    Precision Discovery repeats and realleges each and every allegation contained in paragraphs 1 through 114 as though fully set forth herein.

116.    Counterclaim-Defendants represented that the data storage equipment identified on Schedule J was suitable for Precision Discovery's data storage and IT infrastructure needs.

117.    Counterclaim-Defendants knew that their representations were false, as HDSCC, HDS and Cold Creek were each aware that Precision Discovery had at least 2.38PB of data storage across its HDS equipment, and that the 1.412PB of data storage provided for in Schedule J, of which 930.64TB was usable, was insufficient to meet Precision Discovery's data storage and IT infrastructure needs.

118.    Counterclaim-Defendants further misrepresented the sufficiency of the equipment identified in Schedule J with the purpose of inducing Precision Discovery to rely on their misrepresentations and to enter into the deceptive and fraudulent Schedule J.

119.    In addition, the Installation Certificate, based on which the fraudulent Schedule J was thought to have gone into effect, was knowingly executed under false representations (i.e., that the equipment had been shipped, delivered and installed) and falsified.  Therefore, any representation or claims by Counterclaim-Defendants that any payment was due under Schedule J is false and have been made without legal basis and to the detriment of Precision Discovery, which has paid several hundred thousand dollars under the fraudulent and unenforceable lease.

120.     Relying upon Counterclaim-Defendants' misrepresentations regarding the sufficiency of the equipment identified in Schedule J, Precision Discovery agreed to the terms of Schedule J.

121.     As a result of Precision Discovery's reliance on Counterclaim-Defendants' misrepresentations, Precision Discovery has suffered damages.

### SECOND COUNTERCLAIM AND THIRD-PARTY CLAIM
### (Fraud and Fraudulent Misrepresentation against HDSCC, HDS and Cold Creek)

122.     Precision Discovery repeats and realleges each and every allegation contained in paragraphs 1 through 114 as though fully set forth herein.

123.     Counterclaim-Defendants were aware of Precision Discovery's existing IT infrastructure and data storage needs at the time the parties negotiated the terms of the Schedule J transaction.

124.     Despite their knowledge of Precision Discovery's existing IT infrastructure and data storage needs at the time the parties negotiated the terms of the Schedule J transaction, Counterclaim-Defendants fraudulently misrepresented that the equipment provided for in Schedule J was suitable for Precision Discovery's business needs.

125.     Counterclaim-Defendants also misrepresented the total cost of the Schedule J transaction to Precision Discovery, including misrepresenting the total cost of the G1000 Equipment leased thereunder, by leasing unnecessary Brocade switches in order to make the transaction "fairly lucrative," by charging Precision Discovery $20,000 per month for equipment it had already leased under prior schedules to the Lease Agreement and by including over $4,000,000 in "phantom profits" payable to HDSCC over the 48-month term of the agreement.

126.     Exercising their unethical and unlawful control over Holton, Counterclaim-Defendants also procured a falsely and fraudulently executed Installation Certificate stating that

the G1000 Equipment had been installed when, in reality, the G1000 equipment had not even been shipped and delivered.

127.    Counterclaim-Defendants made these fraudulent misrepresentations, as well as other knowing misrepresentations, during and over the course of negotiating the Schedule J transaction with the intention of inducing Precision Discovery to agree to the fraudulent Schedule J transaction, and thereby defrauding Precision Discovery out of hundreds of thousands of dollars, and attempting to defraud it out of millions of dollars.

128.    Counterclaim-Defendants knew that their misrepresentations were false.

129.    Precision Discovery relied upon Counterclaim-Defendants' misrepresentations in entering into the fraudulent Schedule J transaction.

130.    As a result of Counterclaim-Defendants' fraudulent misrepresentations, Precision Discovery has suffered damages.

### THIRD COUNTERCLAIM AND THIRD-PARTY CLAIM
### (Civil RICO against HDSCC, HDS and Cold Creek)

131.    Precision Discovery repeats and realleges each and every allegation contained in paragraphs 1 through 114 as though fully set forth herein.

132.    Counterclaim-Defendants operated an enterprise engaged in interstate commerce through a pattern of racketeering activity.

133.    Counterclaim-Defendants committed two or more predicate acts of racketeering activity.

134.    Counterclaim-Defendants' actions affected interstate or foreign commerce in that they were committed using both interstate mail and wires.

135.    By way of example only, beginning in approximately June 2016, Counterclaim-Defendants began relying upon mail and wires, including email, to fraudulently induce Precision Discovery into entering into the sham Schedule J transaction.

136.    Likewise, on or about September 9, 2016, Cold Creek sent email messages requesting that Holton fraudulently represent that the G1000 Equipment had been installed by returning a falsified Installation Certificate.  In ultimately heeding to Cold Creek's request, Holton used the mail system and wires to return the falsified Installation Certificate.

137.    Additionally, Precision Discovery's forensic accountants uncovered evidence that Counterclaim-Defendants' fraudulent and deceptive lease practices have extended back to approximately January 2012.

138.    Counterclaim-Defendants' pattern of racketeering activity existed for a significant amount of time prior to the execution of the sham Schedule J transaction and poses a threat of continued criminal conduct beyond the period during which their predicate racketeering activity has already occurred.

139.    As a result of Counterclaim-Defendants' Civil RICO violations, Precision Discovery has suffered damages.

### FOURTH COUNTERCLAIM AND THIRD-PARTY CLAIM
### (Civil Conspiracy against HDSCC, HDS and Cold Creek)

140.    Precision Discovery repeats and realleges each and every allegation contained in paragraphs 1 through 114 as though fully set forth herein.

141.    Counterclaim-Defendants agreed to fraudulently induce Precision Discovery to pay hundreds of thousands, and even millions, of dollars to HDSCC to which HDSCC was not entitled to receive.

142.    Counterclaim-Defendants acted in furtherance of their agreement to defraud Precision Discovery by inducing Precision Discovery to lease equipment that was nearly obsolete and entirely unsuitable for Precision Discovery's business purposes, and by systematically overcharging Precision Discovery pursuant to a lease for both that equipment and Precision Discovery's existing equipment already in its possession.

143.    Counterclaim-Defendants acted in furtherance of their agreement to defraud Precision Discovery by exercising their undue control over Holton in order to procure a falsely and fraudulently executed Installation Certificate stating that the G1000 Equipment had been installed when, in reality, it had not even been shipped or delivered.

144.    Counterclaim-Defendants' participation in furtherance of their combined plan or purpose to defraud Precision Discovery was intentional.

145.    As a result of HDSCC's, HDS's and Cold Creek's agreement to defraud Precision Discovery, and their actions taken in furtherance thereof, Precision Discovery has suffered damages.

**FIFTH COUNTERCLAIM AND THIRD-PARTY CLAIM**
**(Breach of the Implied Warranty of Good Faith and Fair Dealing against HDSCC, HDS and Cold Creek)**

146.    Precision Discovery repeats and realleges each and every allegation contained in paragraphs 1 through 114 as though fully set forth herein.

147.    Counterclaim-Defendants were aware of Precision Discovery's existing IT infrastructure and data storage needs when they negotiated the terms of the fraudulent Schedule J transaction.

148.    By fraudulently inducing Precision Discovery to enter the sham Schedule J transaction, Counterclaim-Defendants failed to act honestly, reasonably, fairly and in good faith.

149.    By fraudulently inducing Precision Discovery to enter the sham Schedule J transaction, Counterclaim-Defendants have destroyed and/or injured Precision Discovery's right to receive the fruits of the Lease Agreement.

150.    By fraudulently inducing Precision Discovery to enter the sham Schedule J transaction, Counterclaim-Defendants breached the implied duty of good faith and fair dealing implicit in all contracts that are governed by New York law.

151.    As a result of HDSCC's, HDS's and Cold Creek's breach of the implied warranty of good faith and fair dealing, Precision Discovery has suffered damages.

### SIXTH COUNTERCLAIM
### (Conversion against HDSCC)

152.    Precision Discovery repeats and realleges each and every allegation contained in paragraphs 1 through 114 as though fully set forth herein.

153.    Before learning of the fraudulent nature of the Schedule J transaction, Precision Discovery paid HDSCC several hundred thousand dollars pursuant to the terms of the sham transaction.

154.    Precision Discovery was the rightful owner of the funds used to pay HDSCC under the terms of the Lease Agreement.

155.    The funds at issue are specifically identifiable and include the amounts that Precision Discovery paid to HDSCC under the terms of the Lease Agreement before learning of the fraudulent nature of the transaction.

156.    As a result of the fraudulent nature of the transaction, HDSCC acted without authorization in accepting and keeping the funds it received from Precision Discovery.

157.    Precision Discovery has made a demand for the payments it made to HDSCC.

158.    HDSCC has refused to return the payments that Precision Discovery has made under the terms of the fraudulent transaction.

159.    As a result of Cold Creek's failure to return Precision Discovery's money, Precision Discovery has suffered damages.

### SEVENTH COUNTERCLAIM
### (Unjust Enrichment against HDSCC)

160.    Precision Discovery repeats and realleges each and every allegation contained in paragraphs 1 through 114 as though fully set forth herein.

161.    As a result of the obvious, irreconcilable and irrevocable conflicts of interests between Counterclaim-Defendants and Holton, Precision Discovery was induced into entering Schedule J, whereby HDSCC knowingly leased Precision Discovery equipment that was nearly obsolete and completely unsuitable for Precision Discovery's business needs.

162.    Counterclaim-Defendants' further misrepresentations regarding the total cost of the Schedule J transaction resulted in HDSCC unfairly charging Precision Discovery for equipment that was unnecessary or that had already been paid for, including over $4,000,000 in "phantom profits" payable to HDSCC over the 48-month term of the agreement.

163.    Counterclaim-Defendants exercised their excessive and unfair control over Holton, which resulted in Holton falsely and fraudulently certifying that the G1000 Equipment had been installed when, in reality, had not even been shipped or delivered.

164.    As a result of this sham transaction, and before realizing the fraudulent nature of the agreement, Precision Discovery has already paid HDSCC several hundred thousand dollars pursuant to Schedule J.

165.    Given the deceptive, fraudulent and inherently conflicted nature of the Schedule J transaction, as well as the undue control that Counterclaim-Defendants wielded over Holton, HDSCC has been unjustly enriched at Precision Discovery's expense.

166.    Therefore, fairness, equity and good conscience dictate that HDSCC should return the money that Precision Discovery has already paid to HDSCC under Schedule J.

167.    As a result of HDSCC's unjust enrichment, Precision Discovery has suffered damages.

## EIGHTH THIRD-PARTY CLAIM
**(Tortious Interference with Contract and Business Relations against HDS and Cold Creek)**

168.    Precision Discovery repeats and realleges each and every allegation contained in paragraphs 1 through 114 as though fully set forth herein.

169.    HDS and Cold Creek were aware of the Lease Agreement and related schedules thereto between Precision Discovery and HDSCC.

170.    HDS and Cold Creek intentionally procured Precision Discovery's breach of the Lease Agreement and Schedules thereto by inducing it to enter into a Schedule that would effectively require Precision Discovery to cease its eDiscovery operations.

171.    HDS and Cold Creek, through their actions, in fact caused Precision Discovery to breach the Lease Agreement.

172.    As a result of HDS's and Cold Creek's tortious interference, Precision Discovery has suffered damages.

## NINTH THIRD-PARTY CLAIM
**(Aiding and Abetting Conversion against HDS and Cold Creek)**

173.    Precision Discovery repeats and realleges each and every allegation contained in paragraphs 1 through 114 as though fully set forth herein.

174.    For the reasons described in Precision Discovery's Seventh Counterclaim against HDSCC, HDSCC committed a conversion against Precision Discovery by accepting and keeping funds it received from Precision Discovery pursuant to the terms of the fraudulent Schedule J transaction.

175.    Both HDS and Cold Creek were aware of that the equipment provided for in the Schedule J transaction was both nearly obsolete and entirely unsuitable for Precision Discovery's business needs.

176.    By negotiating the terms of the Schedule J transaction with Holton, they substantially assisted HDSCC in committing conversion against Precision Discovery.

177.    As a result of HDS's and Cold Creek's actions in aiding and abetting HDSCC's conversion, Precision Discovery has suffered damages.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Counterclaim-Plaintiff Precision Discovery respectfully requests that an award be issued in its favor on the counterclaims asserted herein containing the following relief:

(a)    A declaratory judgment adjudging Schedule J to the Lease Agreement to be unenforceable and enjoining Counterclaim-Defendants from seeking enforcement of its terms;

(b)    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Precision Discovery for all monetary and/or economic damages;

(c)    An award of costs and expenses, as well as reasonable attorneys' fees, that Counterclaim-Plaintiff incurred in this action to the fullest extent permitted by law;

(d)    An award of damages for any and all other monetary and/or non-monetary losses suffered by Precision Discovery in an amount to be determined at trial, plus prejudgment interest;

(e)     An award of punitive and other liquidated and/or exemplary damages to the greatest extent permitted under the law;

(f)     An award of treble damages under applicable law; and

(g)     Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Counterclaim-Plaintiff Precision Discovery hereby demands a trial by jury on all issues of fact and damages in connection with the Counterclaims stated herein.

Dated: March 21, 2018
     New York, New York           **WIGDOR LLP**

By: _____
        Douglas H. Wigdor
        Lawrence M. Pearson
        Renan F. Varghese
        Kenneth D. Walsh

        85 Fifth Avenue
        New York, New York 10003
        Tel: (212) 257-6800
        Fax: (212) 257-6845
        dwigdor@wigdorlaw.com
        lpearson@wigdorlaw.com
        rvarghese@wigdorlaw.com
        kwalsh@wigdorlaw.com

        *Attorneys for Defendant/Counterclaim-Plaintiff/Third-Party Plaintiff*