USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/7/18-15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------

HITACHI DATA SYSTEMS CREDIT
CORPORATION,

                              Plaintiff,

            -against-

PRECISION DISCOVERY, INC., a New
York corporation f/k/a Precision Discovery,
LLC,

                              Defendant.

-------------------------------------------------

17-Cv-6851 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

            This case concerns a contract under which defendant Precision
Discovery, Inc., leased certain data storage equipment from plaintiff,
Hitachi Data Systems Credit Corporation ("HDSCC"). HDSCC alleged in
its initial complaint that Precision had breached the contract by failing to
make the required monthly rent payments. Precision responded to the
complaint with not only an answer, but also nine separate counterclaims
and third-party claims which alleged in sum that the contract was a sham
and that HDSCC – conspiring with third-party defendants Cold Creek
Solutions, Inc., and Hitachi Vantara Corporation[1] – had procured
Precision's agreement to the leasing contract through improper means.
The motions of HDSCC, Hitachi Vantara, and Cold Creek to dismiss these
counterclaims and third-party claims are now before the Court. Because

---

[1] Hitachi Vantara Corporation was originally sued under its former name of "Hitachi
Data Systems," and is sometimes referred to as "HDS" in the briefing relevant to this
decision. The Court will use the name "Hitachi Vantara Corporation" throughout this
decision.

this Court cannot assert personal jurisdiction over the third-party defendants, Precision's third-party claims must be dismissed. Because Precision has failed to state any claim against HDSCC, Precision's counterclaims must also be dismissed. The case will thus revert to being what it truly is: a breach of contract action between a lessor and a lessee.

## I.    Background

The following facts are drawn from Precision's amended counterclaims and third-party complaint (ECF Doc. 56). The Court assumes the truth of the factual allegations in that document for purposes of these motions to dismiss. The Court also relies on the contract at issue, which was attached to HDSCC's original complaint and is integral to Precision's counterclaims and third-party claims. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230-31 (2d Cir. 2016).

Around January 2012, HDSCC and Precision entered into a lease agreement defining the terms under which Precision would lease equipment from HDSCC to be identified in attached schedules. (Def.'s Am. Answer, Counterclaims, and Am. Third-Party Compl. ("Am. Third-Party Compl."), ECF Doc. 56, ¶¶ 34-35.) These schedules were negotiated "from time to time" beginning in January 2012. (*Id.*) All appeared to be well with the arrangement for approximately the next five years. However, in November 2016 an email from a Hitachi Vantara employee made clear that Schedule J, which had been signed by Precision and HDSCC two months earlier, in September 2016, posed serious problems for Precision. (*Id.* ¶¶ 81, 107-108.)

Through the terms of Schedule J, Precision had, according to it, agreed to lease from HDSCC only outdated equipment that could not support Precision's data storage needs, and had further agreed to return all of the other equipment it had previously leased from HDSCC under other schedules, or else pay an additional fee to keep it. (*Id.* ¶¶ 67-68, 77-81, 86-87, 89, 107-108.) As a result, in order to continue running its business, Precision would need to pay significant rent for outdated equipment inadequate for its needs, as well as additional fees in order to

2

keep using the acceptable equipment it had been using previously. (*Id.* ¶¶ 86-88, 107-108.) Precision states that it subsequently discovered that Howard Holton, Precision's Chief Information Officer, had been engaged in what Precision calls an "improper arrangement" with the third-party defendants in this case. (*Id.* ¶ 44.)

Third-party defendant Hitachi Vantara Corporation is the hardware and software company whose products were leased to Precision under the schedules. (*Id.* ¶¶ 14, 37.) (HDSCC, the lessor in the contract at issue, was the finance company that Hitachi Vantara utilized for lease transactions. (*Id.* ¶ 34.)) Third-party defendant Cold Creek Solutions, Inc. is an authorized equipment reseller for Hitachi Vantara. (*Id.* ¶ 23.) According to Precision, both Hitachi Vantara and Cold Creek were closely involved in the negotiation of Schedule J, despite the fact that only lessor HDSCC and lessee Precision are parties to Schedule J and the original lease agreement. (*Id.* ¶¶ 34-38.)

Precision's Chief Information Officer Howard Holton was a negotiator and signatory of Schedule J for Precision. (*Id.* ¶¶ 44, 58, 81.) Over the months prior to and immediately after the signing of Schedule J, Holton had several interactions with Cold Creek and Hitachi Vantara that Precision characterizes as demonstrating an improper and unethical relationship that created "obvious, irreconcilable and irrevocable conflicts of interest[.]" (*Id.* ¶¶ 44-65.) For instance, while Holton was employed by Precision, he was also secretly earning additional income as a consultant or contractor for Cold Creek. (*Id.* ¶¶ 46-47.) Without Precision's knowledge, Hitachi Vantara and Cold Creek also provided Holton with various expensive gifts allegedly including lavish meals, alcohol, and tickets to sports events. (*Id.* ¶¶ 52-56, 65.) Holton had a particularly close relationship with one Hitachi Vantara employee, Billy Metting, who allowed Holton to borrow his truck, eventually selling it to him. (*Id.* ¶¶ 58-63.)

Precision alleges that Cold Creek and Hitachi Vantara, working with HDSCC, leveraged these improper interactions to induce Holton into

3

executing Schedule J on Precision's behalf, all the while knowing that the equipment they were providing was unsuitable for Precision. (*Id.* ¶¶ 36-43, 64, 66-91.) Precision also alleges that a Cold Creek employee induced Holton to fraudulently sign an installation certificate claiming that the equipment had been installed, when in fact it had not been, in order for the Cold Creek and Hitachi Vantara sales teams to be able to receive their commissions. (*Id.* ¶¶ 92-106.)

Finally, Precision alleges that with the help of forensic accountants, it discovered that in addition to improperly inducing Holton to execute Schedule J and sign the installation certificate, HDSCC, Cold Creek, and Hitachi Vantara had "perpetrated a scheme to defraud Precision Discovery into making approximately $2.5 million in overpayments over the prior six years." (*Id.* ¶ 112.). Precision provides very few details about this scheme, only alleging that "the overpayments were extremely difficult to detect, as they were the result of HDSCC's business practice of rolling Precision Discovery's existing leases into new leases, and then overcharging Precision Discovery large amounts on equipment that was actually included in the prior leases." (*Id.* ¶ 3.)

Based on the above facts, Precision asserts five causes of action against both plaintiff HDSCC and third-party defendants Hitachi Vantara and Cold Creek; two causes of action solely against HDSCC; and two causes of action solely against the third-party defendants. Against both HDSCC and the third parties, Precision asserts a claim of fraudulent inducement with regard to Schedule J; a claim of fraud and fraudulent misrepresentation regarding Schedule J; a civil RICO claim based on use of interstate mail and wires to defraud Precision; a civil conspiracy claim; and a claim for breach of the implied warranty of good faith and fair dealing. (*Id.* ¶¶ 115-151.) Against only HDSCC, Precision asserts a claim of conversion regarding the funds it paid to HDSCC pursuant to Schedule J before discovering it was fraudulent, and an unjust enrichment claim regarding those same funds. (*Id.* ¶¶ 152-167.) Against only Hitachi Vantara and Cold Creek, Precision asserts a claim of tortious interference with

4

contract and business relations, arguing that Hitachi Vantara and Cold Creek caused Precision to breach the Schedule J agreement by fraudulently inducing Precision to execute it, and a claim of aiding and abetting HDSCC's conversion. (*Id.* ¶¶ 168-177.)

As relief for these claims, Precision requests a declaration that Schedule J is unenforceable; an injunction barring HDSCC, Cold Creek, and Hitachi Vantara from seeking Schedule J's enforcement; and money damages. (*Id.* at 36-37.)

HDSCC has now moved to dismiss all of Precision's claims against it for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), and third-party defendants Hitachi Vantara and Cold Creek have also moved to dismiss all third-party claims against them. The third party-defendants move both for failure to state a claim pursuant to Rule 12(b)(6) and for lack of personal jurisdiction over them pursuant to Rule 12(b)(2). This Court subsequently permitted Precision to file an amended version of its counterclaims and third-party complaint meant to respond to the personal jurisdiction arguments raised by Cold Creek and Hitachi Vantara, specifying that the pending motions to dismiss would remain in place. *See* Order dated Mar. 19, 2018, ECF Doc. 55.

## II. Legal Standards

As noted above, HDSCC moves pursuant to Rule 12(b)(6), while Hitachi Vantara and Cold Creek move pursuant to both Rule 12(b)(6) and Rule 12(b)(2).

When considering a Rule 12(b)(6) motion to dismiss, a court must "draw all reasonable inferences in [the non-movant's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). In other words, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir.

5

2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While facts alleged in the complaint must be accepted as true, factual allegations are distinguished from "conclusory allegations or legal conclusions masquerading as factual conclusions," which courts are "not . . . bound to accept." *Faber*, 648 F.3d at 104 (internal quotation marks omitted). This standard, which typically applies to a defendant's motion to dismiss a plaintiff's complaint, applies equally to a counterclaim defendant's motion to dismiss a counterclaim, and to a third-party defendant's motion to dismiss a third-party complaint. *See Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 531 F. Supp. 2d 620, 622 (S.D.N.Y. 2008); *U.S. Bank Nat'l Ass'n v. BFPRU I, LLC*, 230 F. Supp. 3d 253, 259 (S.D.N.Y. 2017).

In order to defeat the third-party defendants' motions to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction, Precision "must make a prima facie showing that jurisdiction exists," which "entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited, would suffice to establish jurisdiction[.]" *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 81 (2d Cir. 2018) (alteration removed) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010)). "On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the Court may look beyond the four corners of the complaint and consider all pleadings and accompanying affidavits and declarations, while still 'resolving all doubts in [the non-movant's] favor.'" *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 737 n.1 (S.D.N.Y. 2013) (citing *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001)).

## III. Discussion

### A. Lack of Personal Jurisdiction Over Third-Party Defendants

The third-party defendants each argue that they are not subject to personal jurisdiction in New York and that therefore the third-party complaints against them must be dismissed for lack of jurisdiction. More specifically, both Hitachi Vantara and Cold Creek argue that even assuming that the text of New York's long-arm statute might cover the

6

third-party defendants, the federal Constitution's due process limitations do not permit this Court to exercise either general or specific personal jurisdiction over parties that have had the limited contact with the state of New York that they have had. Precision makes no serious argument to the contrary, almost entirely ignoring the third-party defendants' due process arguments. For the reasons set forth below, the Court finds that it does not have personal jurisdiction over either Hitachi Vantara or Cold Creek.

### 1. *General Jurisdiction*

Both third-party defendants contend that they are not subject to general, or all-purpose, jurisdiction in New York because they are not "essentially at home" in the state as the federal Constitution requires. The Court agrees.

As the U.S. Supreme Court made clear in *Daimler AG v. Bauman*, due process requires that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." 571 U.S. 117, 137 (2014). For a corporation, general jurisdiction is typically available only in the forum in which it is incorporated as well as the forum in which its principal place of business is located. *See Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) (citing *Daimler*, 571 U.S. at 139 & n.19). The fact that a corporation does business in a state, even "substantial, continuous, and systematic" business, is not necessarily enough to subject the corporation to general jurisdiction in the state. *See Daimler*, 571 U.S. at 137-38. Rather, the corporation's affiliations with the forum must be "so continuous and systematic as to render it essentially at home in the forum State." *Id*. at 139 (internal quotation marks and alterations omitted). Only in an "exceptional case" does a corporation have "operations in a forum other than its formal place of incorporation or principal place of business" that are "so substantial and of such a nature as to render the corporation at home in that State." *Daimler*, 571 U.S. at 139 n.19; *see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) ("in our view *Daimler* established that, except in a truly 'exceptional'

7

case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business[.]").

Precision points out that New York's long-arm statute authorizes general jurisdiction rather broadly, permitting the exercise of such jurisdiction for a corporation that does business in New York "not occasionally or casually, but with a fair measure of permanence and continuity." *See Sonera Holding B.V. v. Çukurova Holding A.Ş.*, 750 F.3d 221, 224 n.2 (2d Cir. 2014) (citing *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267 (1917)). However, Precision fails to recognize that in order for this Court to exercise general jurisdiction, two separate requirements must be met: "1) state law must authorize general jurisdiction; *and* 2) jurisdiction must comport with constitutional due process principles." *Reich v. Lopez*, 858 F.3d 55, 62 (2d Cir. 2017) (emphasis added) (internal quotation marks omitted). As the Second Circuit has recognized, it is entirely possible for the requirements of New York law to be satisfied, but for personal jurisdiction to nevertheless be absent due to constitutional requirements. *See Sonera*, 750 F.3d at 224-25 & n. 2 ("There is no need to address the scope of general jurisdiction under New York law because the exercise of general jurisdiction over Çukurova is clearly inconsistent with *Daimler*.").

Even assuming that Precision is correct in its argument that the requirements of New York law are satisfied by the third-party defendants' business activities in New York, Precision has not made sufficient allegations to support the notion that an assertion of general jurisdiction here would comply with due process requirements post-*Daimler*. It is undisputed that neither Cold Creek nor Hitachi Vantara is incorporated in New York, and that neither corporation has its principal place of business in New York. Cold Creek is incorporated in and has its principal place of business in Colorado. Am. Third-Party Compl. ¶ 23. Hitachi Vantara is incorporated in Delaware and has its principal place of business in California. Am. Third-Party Compl. ¶ 14.

The allegations by Precision in its third-party complaint against Cold Creek regarding Cold Creek's contacts in New York are merely that

8

Cold Creek did business with *Precision* while knowing that *Precision's* headquarters were located in New York; that *Precision* paid invoices to Cold Creek from its offices in New York; and that Cold Creek "was availing itself of business transactions occurring in New York." Am. Third-Party Compl. ¶¶ 24, 28, 32, 33. These allegations are patently insufficient to add up to the "exceptional case" required by *Daimler*. Indeed, they are barely sufficient to establish that Cold Creek regularly does business in New York.

As to Hitachi Vantara, Precision alleges that Hitachi Vantara is registered to do business in New York, maintains an office in New York, and does "extensive business" in the state. Am. Third-Party Compl. ¶¶ 18-19. While these allegations are more substantial than those asserted with regard to Cold Creek, they are still not enough to suggest that the corporation's activities in New York are so significant as to constitute the "exceptional case" contemplated by *Daimler*.

As the Second Circuit has explained, "when a corporation is neither incorporated nor maintains its principal place of business in a state, mere contacts, no matter how 'systematic and continuous,' are extraordinarily unlikely to add up to an 'exceptional case.'" *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 629 (2d Cir. 2016). Courts have often noted that allegations similar to those Precision makes here – particularly in regard to maintaining an office in New York and registering to do business in the state – are not sufficient to provide general jurisdiction after *Daimler*. *See, e.g., Henkin v. Gibraltar Private Bank & Trust Co.*, CV 16-5452, 2018 WL 557866, at *3 (E.D.N.Y. Jan. 22, 2018) (finding that maintenance of an office in New York was not sufficient to create an exceptional case under *Daimler*); *Sae Han Sheet Co., Ltd. v. Eastman Chemical Corp.*, 17 Civ. 2734, 2017 WL 4769394, at *3-*6 (S.D.N.Y. Oct. 19, 2017) (finding that registering to do business in New York State does not amount to consent to general jurisdiction, and citing cases); *see also Gucci America, Inc. v. Weixing Li*, 768 F. 3d 122, 135 (2d Cir. 2014) (no general

9

personal jurisdiction over a bank with branch offices in the forum but incorporated and headquartered elsewhere).

Finally, Precision's allegation that "[u]pon information and belief, [Hitachi Vantara] conducts extensive business in the state of New York," Am. Third-Party Compl. ¶ 18, is both vague and conclusory. Even if this were not the case, as explained above, evidence that a corporation which is neither incorporated nor headquartered in a state does business in that state is generally not enough to subject the corporation to general jurisdiction there. Rather, there must be something exceptional about a corporation's connection to that state that places the corporation "at home" there. Precision has made no allegation of any such exceptional connection here. Therefore, to assert general jurisdiction over Hitachi Vantara would violate the due process principles set forth in *Daimler*.

### 2. *Specific Jurisdiction*

Although neither Hitachi Vantara nor Cold Creek can be fairly described as at home in New York, and thus the third-party defendants are not subject to general jurisdiction in the state, Precision may still bring its third-party complaint against them in this District if they are nonetheless subject to specific jurisdiction in New York. For the reasons below, the Court finds that they are not.

In order for a court to assert specific jurisdiction over a defendant, due process requires that "the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). Importantly, this substantial connection must be created *by the actions of the defendant seeking to avoid the assertion of jurisdiction* – meaning, in this case, the requisite connections must have been created by Hitachi Vantara and Cold Creek, rather than by Precision. *See Walden*, 571 U.S. at 284. Also important is the requirement that the contacts must be "with the forum State itself, not . . . with persons who reside there." *Id*. at 285. Here, Precision seeks to base specific personal jurisdiction over Hitachi Vantara and Cold Creek in New York largely on the fact that *Precision* – the plaintiff on this third-party complaint – has its headquarters

10

in New York. But the Supreme Court has clearly held that in order for specific jurisdiction to apply, "the plaintiff cannot be the only link between the defendant and the forum." *Id.* This ensures that defendants such as Hitachi Vantara and Cold Creek "will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts" with that jurisdiction. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (internal quotation marks omitted).

Here, Precision alleges various interactions between the third-party defendants and itself, but fails to allege that any interaction that did occur had anything to do with New York. The only specific action that Precision alleges took place in New York is *Precision's* payment of invoices from its offices there. Am. Third-Party Compl. ¶ 28. But this action taken by Precision is not relevant to the jurisdictional analysis, as it is Cold Creek's and Hitachi Vantara's conduct, not Precision's, which must establish a substantial connection to New York. *See Walden,* 571 U.S. at 284 ("the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State.").

Moreover, Hitachi Vantara and Cold Creek both submit completely unchallenged declarations explaining that many of the interactions between the third-party defendants and Precision which are relevant to this suit took place outside of New York. Indeed, the declarations indicate that all business involving Schedule J was centered in Colorado, rather than New York. For instance, the declarations state that Hitachi Vantara, Cold Creek, and Precision all have offices in Colorado, and that "all meetings, discussions and/or presentations took place" in Colorado. Aff. of Paul Schwappach dated Feb. 2, 2018, ¶¶ 1-2, 5, 7; Decl. of William Metting dated Jan. 16, 2018, ¶¶ 2, 10. The declarations also state that the major figures involved in the alleged fraud, including Howard Holton (the allegedly faithless Precision employee), William Metting (a declarant and Hitachi Vantara employee who allegedly engaged in improper behavior), and Paul Schwappach (a declarant and Cold Creek employee who allegedly engaged in improper behavior) all worked out of Colorado.

11

Schwappach Aff. ¶¶ 1-2, 5; Metting Decl. ¶¶ 2, 8; Am. Third-Party Compl. ¶¶ 44, 58-63, 99-100. Finally, the declarations state that the equipment at issue was delivered to Precision's office in Colorado, not to its New York headquarters, and that "all billings and communications to Precision were sent to and processed by Precision's Colorado offices." Schwappach Aff. ¶¶ 8-9; Metting Decl. ¶ 13.

Rather than challenge these assertions by Hitachi Vantara and Cold Creek, Precision argues that specific jurisdiction is proper under N.Y. C.P.L.R. § 302(a), which provides in part that personal jurisdiction is available for a "non-domiciliary . . . who in person or through an agent . . . commits a tortious act without the state causing injury to person or property within the state" so long as that non-domiciliary both "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce[.]" Precision does indeed allege that it was financially injured at its headquarters in New York, and that both Cold Creek and Hitachi Vantara knew that their allegedly fraudulent actions would hurt Precision there.[2] Precision also presents evidence that the third-party defendants engage in interstate commerce. *See* Exs. A-M to Decl. of Lawrence M. Pearson dated Apr. 18, 2018. But once again, Precision fails to recognize that in addition to having a valid statutory basis, "the exercise of personal jurisdiction must comport with constitutional due process principles." *Waldman v.*

---

[2] The Court notes that there is some doubt that these allegations are sufficient under the relevant portion of N.Y. C.P.L.R. § 302(a): courts have noted that "[i]t is settled New York law that the suffering of economic damages in New York is insufficient, alone, to establish a 'direct' injury in New York for N.Y. C.P.L.R. § 302(a)(3) purposes." *Penguin Grp. (USA) Inc. v. American Buddha,* 609 F.3d 30, 38 (2d Cir. 2010). Similarly, "[t]he occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the underlying events took place outside New York." *NewMarkets Partners LLC v. Oppenheim,* 638 F. Supp. 2d 394, 403 (S.D.N.Y. 2009) (quoting *Whitaker v. Am. Telecasting, Inc.,* 261 F.3d 196, 209 (2d Cir. 2001)). However, the Court need not decide this issue because, as explained below, exercising specific jurisdiction on this basis would violate constitutional due process principles, and is therefore impermissible.

12

*Palestine Liberation Org.,* 835 F.3d 317, 327 (2d Cir. 2016) (internal quotation marks omitted).

As noted above, the Supreme Court held in *Walden v. Fiore* that in order for an exercise of specific jurisdiction to be constitutionally proper, "the defendant's suit-related conduct must create a substantial connection with the forum State." 571 U.S. at 284. In the wake of that decision, the Second Circuit has explained that "[t]he relevant 'suit-related conduct' . . . [is] the conduct that could have subjected [defendants] to liability[.]" *Waldman,* 835 F.3d at 335. Here, that conduct is Hitachi Vantara's and Cold Creek's alleged participation in the fraudulent inducement of Precision's agreement to Schedule J and the installation certificate, as well as their alleged participation in overcharging Precision for leased equipment over a longer period of time.

The declarations before the Court state that this conduct occurred in Colorado, not in New York, and Precision has not alleged otherwise in its third-party complaint. Thus, it appears that no suit-related conduct by Hitachi Vantara or Cold Creek occurred in New York. Although Precision does not raise the possibility that personal jurisdiction may nonetheless be constitutionally proper under the "effects test," such an argument would have failed if it had been made. Under the "effects test," even conduct that takes place entirely outside the forum may be enough to allow personal jurisdiction if "the defendant expressly aimed its conduct at the forum." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 732 F.3d 161, 173 (2d Cir. 2013). However, the Second Circuit has explained that in the wake of *Walden,* "mere knowledge that a plaintiff resides in a specific jurisdiction would be insufficient to subject a defendant to specific jurisdiction in that jurisdiction if the defendant does nothing in connection with the tort in that jurisdiction." *Waldman,* 835 F.3d at 338.

That is the scenario we have here. The allegations by Precision and the declarations by officials of Hitachi Vantara and Cold Creek demonstrate that all conduct by Hitachi Vantara and Cold Creek related to this lawsuit – including relevant interactions between Precision and those

13

companies – took place in Colorado. The sole connection between the third-party defendants' suit-related conduct and New York is the allegation that while Cold Creek and Hitachi Vantara were defrauding Precision in Colorado, they knew that Precision's headquarters were located in New York. That knowledge is not enough to subject the third-party defendants to personal jurisdiction in New York.

Although Cold Creek and Hitachi Vantara may have been able to foresee harm in New York as a result of their interactions with Precision in Colorado, "the fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *In Re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013). And although Precision has alleged that Hitachi Vantara has some contacts with New York other than its knowledge of Precision's presence there – such as the fact that it has an office in New York and does business there – there is no allegation of any relationship between these contacts and the alleged wrongdoing. Under a specific jurisdiction analysis, "defendants cannot be made to answer in this forum with respect to matters unrelated to the forum connections." *Waldman*, 835 F.3d at 341 (internal quotation marks omitted).

Because Precision has not alleged that Hitachi Vantara or Cold Creek engaged in suit-related conduct that took place in New York or was expressly aimed at New York, it has not met its burden to make a prima facie showing that specific personal jurisdiction over those third-party defendants exists in this state.

### 3. *Nationwide Service of Process and Civil RICO Claim*

For the reasons set forth above, the Court finds that the third-party defendants do not have a sufficient relationship to New York to be subject to either general or specific personal jurisdiction in this state. Nonetheless, Precision urges that personal jurisdiction over Cold Creek and Hitachi Vantara is present because one of Precision's numerous third-party claims is a claim made under the civil RICO statute, which provides for nationwide service of process. *See* 18 U.S.C. § 1965(b). Because Precision

14

has failed to state a valid civil RICO claim, it cannot rely on this provision, and thus its final argument for personal jurisdiction over the third-party defendants fails.

### a. Extent of Personal Jurisdiction Authorized by Civil RICO Statute

The Second Circuit has held that 18 U.S.C. § 1965 "does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found." *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 71 (2d Cir. 1998). Rather, the court explained, "a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant." *Id.* Once that initial personal jurisdiction is established, the statute authorizes the court's assertion of nationwide personal jurisdiction over other parties, including co-defendants and third-party defendants, where the "ends of justice" so require. *Id.* In order to comply with due process, any such additional defendant need meet only a national contacts test, meaning they must have minimum contacts with the United States. *See Herbstein v. Bruetman*, 768 F. Supp. 79, 81 (S.D.N.Y. 1991). If these requirements are satisfied, the Court may also be permitted to exercise personal jurisdiction over such defendants for other claims that arise out of the same operative facts as the civil RICO claim, even if personal jurisdiction would not otherwise be present as to those claims. *See IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056-7 (2d Cir. 1993).

Because the notion that HDSCC (the original plaintiff and counterclaim defendant in this case) is subject to personal jurisdiction in New York is not in dispute, and because Cold Creek and Hitachi Vantara clearly have extensive contacts with the United States, Precision suggests that this Court may exercise personal jurisdiction over the third-party defendants. Cold Creek and Hitachi Vantara argue that Precision has failed to state a valid civil RICO claim, and that therefore the claim must be dismissed pursuant to Rule 12(b)(6). If a civil RICO claim is dismissed,

15

that statute's authorization of a national personal jurisdiction analysis can no longer be relied upon. *See Sterling Interiors Group, Inc. v. Haworth, Inc.,* No. 94 Civ. 9216, 1996 WL 426379, at *14 (S.D.N.Y. July 30, 1996).

### b. *Precision Fails to State a Civil RICO Claim*

Hitachi Vantara and Cold Creek both contend that Precision has failed to state a civil RICO claim for two principal reasons: first, that it has failed to allege adequately the existence of an enterprise-in-fact; and second, that it has failed to allege a pattern of racketeering activity. Because the Court agrees that Precision has failed to allege a pattern of racketeering activity, and such a pattern must be alleged in order for Precision's claim to survive, the third-party defendants' arguments regarding the enterprise-in-fact element need not be addressed. *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 175 (2d Cir. 2004).

In order to adequately plead the existence of a RICO pattern, Precision must allege facts giving rise to an inference of either closed-ended or open-ended continuity. *See H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 240-41 (1989). Closed-ended continuity refers to a "closed period of repeated conduct," and open-ended continuity refers to "past conduct that by its nature projects into the future with a threat of repetition." *Id.* Here, Precision has adequately alleged neither.

To adequately plead closed-ended continuity, a plaintiff must allege "a series of related predicates extending over a substantial period of time." *H.J.,* 492 U.S. at 242. This period of time is measured with reference to "the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Spool v. World Child Intern. Adoption Agency,* 520 F.3d 178, 184 (2d Cir. 2008). In general, two years is considered a minimum "substantial period of time" in this Circuit. *See Spool,* 520 F.3d at 184; *DiFalco v. Bernas,* 244 F.3d 286, 321 (2d Cir. 2001). The Second Circuit has "not viewed two years as a bright-line requirement," but has explicitly acknowledged that "it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where . . . the activities

16

alleged involved only a handful of participants and do not involve a complex, multi-faceted conspiracy." *Spool*, 520 F.3d at 184 (internal quotation marks omitted).

Precision has not alleged RICO predicates extending over two years. The operative pleading alleges that "beginning in approximately June 2016, Counterclaim-Defendants began relying upon mail and wires, including email, to fraudulently induce Precision Discovery into entering into the sham Schedule J transaction." Am. Third-Party Compl. ¶ 135. It further alleges that "on or about September 9, 2016, Cold Creek sent email messages requesting that Holton" fraudulently sign the installation certificate. *Id.* ¶ 136. These allegations of mail and wire fraud predicates amount to a time period of less than one year.

Precision tries to escape this fact by claiming that it has pleaded additional, earlier predicates by alleging that "Precision Discovery's forensic accountants uncovered evidence that Counterclaim-Defendants' fraudulent and deceptive lease practices have extended back to approximately January 2012." *Id.* ¶ 137. But this vague allegation does not amount to an allegation of a RICO predicate. It is unclear from the allegation if mail or wire fraud was used to accomplish these "fraudulent and deceptive lease practices," and not a single instance of a specific fraudulent action is alleged to have taken place prior to June 2016. This falls far short of the Rule 9(b) particularity requirement that fraud-based RICO predicates are required to meet. *See O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) ("Because plaintiffs premise these [RICO and other] claims, in large part, on defendants' alleged fraudulent conduct, plaintiffs must comply with Rule 9(b)[.]"). Precision's further allegation that "Counterclaim-Defendants' pattern of racketeering activity existed for a significant amount of time prior to the execution of the sham Schedule J transaction," Am. Third-Party Compl. ¶ 138, is conclusory and is completely unsupported by specific factual allegations.

17

Precision has only alleged RICO predicates extending over a period of several months, falling far short of the general two-year minimum. This Court sees no reason to depart from that general minimum in this case, which is not particularly complex. Thus, Precision has failed to establish closed-ended continuity.

The matter of open-ended continuity still remains. Precision contends that its allegations demonstrate a continuing threat of criminal activity because it alleges that the "Counterclaim Defendants' pattern of racketeering activity . . . poses a threat of continued criminal conduct beyond the period during which their predicate racketeering activity has already occurred." Am. Third-Party Compl. ¶138. This allegation consists of a conclusory paraphrase of the relevant case law and therefore the Court need not credit it on these motions.

Precision also urges that the alleged fraud predicates constituted the "regular way" in which Cold Creek, Hitachi Vantara, and HDSCC did business and thus that the requirement of alleging open-ended continuity has been satisfied. *See Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 243 (2d Cir. 1999) ("where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity."). However, as noted above, the actual fraudulent predicates that Precision has alleged are quite limited – they took place over the course of a few months, and all involved Schedule J. They are thus insufficient to give rise to a plausible inference that Cold Creek and Hitachi Vantara regularly conducted business in a fraudulent manner.

Therefore, Precision has adequately alleged neither open-ended nor closed-ended continuity. In the absence of continuity, there can be no pattern of racketeering activity. *See H.J.*, 492 U.S. at 240-41. Because Hitachi Vantara and Cold Creek are not subject to personal jurisdiction in New

York, the third-party claims against them must be dismissed pursuant to Rule 12(b)(2).[3]

### B. Precision Fails to State Any Claim Against HDSCC

As noted, HDSCC has moved to dismiss the numerous counterclaims against it pursuant to Rule 12(b)(6). For the reasons set forth below, the Court finds that the operative pleading fails to state any counterclaim against HDSCC, and must therefore be dismissed.

#### 1. *Fraudulent Inducement and Fraudulent Misrepresentation*

The first two counterclaims that Precision asserts against HDSCC are claims of fraudulent inducement and fraudulent misrepresentation based on the same facts. Precision alleges that HDSCC knowingly misrepresented the suitability of the equipment it leased to Precision under Schedule J for Precision's business needs, and that Precision entered into the Schedule J lease in reliance on this misrepresentation. *See* Am. Third-Party Compl. ¶¶ 116-118, 120, 123-125, 127-129. Precision also alleges under these counts that the installation certificate was falsely entered into, and that therefore HDSCC is not entitled to any of the rent payments it demands. *See* Am. Third-Party Compl. ¶¶ 119, 126.

---

[3] In its memoranda of law opposing the motions to dismiss filed by Hitachi Vantara and Cold Creek, Precision requests in a footnote the opportunity to conduct jurisdictional discovery, but provides no explanation of what evidence it would seek to discover or how that evidence would cure the deficiencies in its current jurisdictional allegations. This Court has discretion to deny a request for discovery regarding personal jurisdiction "where the allegations fail to state a basis for the exercise of jurisdiction, or where a plaintiff's proposed discovery, even if permitted, would not uncover facts sufficient to sustain jurisdiction." *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618, 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009); *see also Ehrenfeld v. Mahfouz*, 489 F.3d 542, 550 n.6 (2d Cir. 2007). Because Precision has made no indication of a theory on which personal jurisdiction would be proper in this case other than those the Court has already found to be legally insufficient, nor explained how discovery would permit it to support any such theory if it did exist, its passing request for jurisdictional discovery is denied.

In order to make out a claim of fraudulent inducement or fraudulent misrepresentation under New York law, a plaintiff must allege that: "1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004) (fraudulent misrepresentation); *see also Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415-16 (2d Cir. 2006) (fraudulent inducement).

HDSCC contends that Precision has not sufficiently alleged any of these elements, and that the "hell or high water" clause in the lease at issue bars Precision from asserting any fraud-based counterclaims.[4] The Court finds that because the express disclaimer in the relevant lease agreement specifically states that HDSCC made no representation regarding the suitability of the leased equipment, Precision cannot now claim that it reasonably relied on such a misrepresentation, and its claims of fraudulent inducement and fraudulent misrepresentation must therefore be dismissed.

The Lease Agreement executed by lessor HDSCC and lessee Precision in January 2012 is expressly incorporated into Schedule J, and together the two documents make up the lease agreement pertaining to the equipment listed in Schedule J. *See* January 2012 Lease Agreement, Ex. 1 to Compl., ECF Doc. 1-2, at 1 ("Each Schedule shall constitute a separate and independent lease and contractual obligation incorporating the terms to this [Lease Agreement]."); Schedule J, Ex. 2 to Compl., ECF Doc. 1-2 ("Lessee and lessor agree that this schedule incorporates the terms of the referenced lease agreement which, together with the terms of this schedule, constitute the lease between lessee and lessor for the

---

[4] HDSCC identifies the "hell or high water clause" as the portion of the contract stating that "Lessee's obligations to pay all amounts due are absolute and unconditional and shall not be subject to any abatement, reduction, set off, defense, counterclaim, interruption, deferment or recoupment for any reason whatsoever." January 2012 Lease Agreement, Ex. 1 to Compl., ECF Doc. 1-2, § 5.

equipment."). The January 2012 Lease Agreement, and thus the lease for the equipment listed in Schedule J, explicitly states that "lessor has not made, and does not hereby make, any representation or warranty as to the title, merchantability, performance, condition, quality, description, durability, fitness or suitability for purpose by lessee or any other person of any of the equipment . . . or any other representation or warranty with respect to the equipment." January 2012 Lease Agreement § 6.3.

Under well-established New York law, if a party to a contract has "stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded," then the "specific disclaimer destroys the allegations in [the party's] complaint that the agreement was executed in reliance upon" any such misrepresentation. *See Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-21 (1959); *see also Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 734 (2d Cir. 1984) (citing *Danann* as holding that "where a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud, assert it was fraudulently induced to enter into the contract by the very representation it has disclaimed.").

That is precisely – pun intended – the case here. Precision executed an agreement with HDSCC which specifically stated that HDSCC had not made any representation regarding the suitability of the equipment in Schedule J for Precision's purposes. *See* January 2012 Lease Agreement § 6.3. Precision now claims that it was defrauded because it relied upon a misrepresentation that "the data storage equipment identified on Schedule J was suitable for Precision Discovery's data storage and IT infrastructure needs." Am. Third-Party Compl. ¶¶ 116, 124. The *Danann* rule specifically bars such a claim, as the specific disclaimer "make[s] it impossible for [Precision] to prove one of the elements of a claim of fraud: that it reasonably relied on the representations that it alleges were made to induce it to enter into" Schedule J. *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 319 (S.D.N.Y. 2002).

Precision's arguments to the contrary are meritless. Precision first cites to case law suggesting that reasonable reliance is a factual matter that should not be decided without the benefit of discovery. However, the case law on which Precision relies does not involve an express disclaimer such as the one here and is thus easily distinguishable. *See Space Coast Credit Union v. Barclays Capital, Inc.*, No. 11 Civ. 2802, 2012 WL 946832, at *1 (S.D.N.Y. Mar. 20, 2012). Courts applying New York law have dismissed fraud claims pursuant to the *Danann* rule at the motion to dismiss stage. *See Harsco Corp. v. Segui*, 91 F.3d 337, 345-47 (2d Cir. 1996); *see also DynCorp*, 215 F. Supp. 2d at 319-321.

Next, Precision contends that because the express disclaimer is contained only in the 2012 Lease Agreement, and not in Schedule J, it is not part of the lease of the Schedule J equipment. That argument fails because, as noted above, Schedule J specifically incorporates the 2012 Lease Agreement and states that the two documents together constitute the lease of the Schedule J equipment. *See* Schedule J; *see also* January 2012 Lease Agreement at 1.

Finally, Precision points out that the January 2012 Lease Agreement states that Precision is "entitled under Article 2A of the UCC to the promises and warranties, including those of any third party, provided to Lessor [HDSCC] by the Vendor in connection with the contract pursuant to which Lessor acquired the Equipment (or the right to use the Equipment)." 2012 Lease Agreement § 6.2. Precision argues that because such warranties provided by the Vendor are not yet before the Court, its fraud claims should not be dismissed at this point.

Even assuming that a misrepresentation in such a vendor warranty could be attributed to HDSCC, in order to sufficiently plead a claim of fraud, pursuant Fed. R. Civ. P. 9(b) Precision must state its case with particularity – meaning it must "(1) specify the statements that [it] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (citation

omitted). Precision has not alleged any of this information about any potential warranty made by a vendor and thus cannot rely on such a possible warranty to state a claim for fraud.

Although Precision mentions the installation certificate under its fraud claims in the operative pleading, in its briefing on the motion to dismiss the counterclaims it does not argue that Howard Holton's signing of the installation certificate can support either a fraudulent inducement or fraudulent misrepresentation claim. To the extent that Precision does allege that Holton's alleged false endorsement of the installation certificate makes out a claim of fraud against HDSCC, that claim must fail. The only false statement alleged to be made with regard to that incident was made by Holton, an employee of Precision. Thus, Precision does not allege that HDSCC made any false statement with regard to the installation certificate – a necessary element of any fraud claim. *See Eternity Global Master*, 375 F.3d at 186-87.

Because Precision has not sufficiently alleged each of the necessary elements for a fraud claim, its counterclaims against HDSCC for fraudulent misrepresentation and fraudulent inducement must be dismissed pursuant to Rule 12(b)(6).

### 2. *Civil RICO*

Precision pleads it civil RICO claims against HDSCC, Hitachi Vantara, and Cold Creek together, and all three of those parties make similar arguments for why the civil RICO claims must be dismissed. The Court has already found, *supra* Section III.A.3.b, that Precision has failed to state a civil RICO claim pursuant to Rule 12(b)(6) because it has not adequately alleged continuity and therefore has not adequately alleged the existence of a pattern of racketeering activity. For the same reason, the civil RICO claim against HDSCC must be dismissed.

### 3. *Civil Conspiracy*

HDSCC contends that Precision's counterclaim alleging that HDSCC engaged in a civil conspiracy with Hitachi Vantara and Cold

23

Creek must be dismissed because Precision has not adequately alleged any underlying tort. Although Precision admits that in order to state a claim for civil conspiracy, it must also plead an underlying tort, *see Ray Legal Consulting Group v. DiJoseph*, 37 F. Supp. 3d 704, 722 (S.D.N.Y. 2014) ("a claim for civil conspiracy may only lie if it is connected to a separate underlying tort"), it suggests that it has met this requirement by adequately pleading its fraud claims and its civil RICO claim. However, the Court has already determined that Precision has not set forth either a fraud claim or a civil RICO claim. Therefore, no underlying tort has been properly alleged and Precision's civil conspiracy counterclaim against HDSCC must be dismissed pursuant to Rule 12(b)(6).

### 4. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Precision also alleges that HDSCC has breached the implied covenant of good faith and fair dealing that is generally part of all contracts under New York law. Precision's claim is again based on its allegation that HDSCC induced Precision to agree to Schedule J knowing that the equipment provided would be unsuitable. Am. Third-Party Compl. ¶¶ 147-150.

"In order to find a breach of the implied covenant [of good faith and fair dealing], a party's action must directly violate an obligation that may be presumed to have been intended by the parties." *Gaia House Mezz LLC v. State Street Bank and Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (internal quotation marks omitted). "The covenant cannot be used . . . to imply an obligation inconsistent with other terms of a contractual relationship." *Id.* (citing *Dalton v. Educational Testing Service*, 87 N.Y. 2d 384, 389 (1995)).

Here, the contractual relationship at issue is that established by Precision's agreement with HDSCC to lease the equipment listed in Schedule J under the terms contained in the January 2012 Lease Agreement. Precision does not allege that HDSCC prevented it from leasing the equipment listed in Schedule J, or failed to provide that equipment as promised, or violated any other obligation contained or

24

presumably intended by that agreement. Rather, Precision asserts that the equipment in Schedule J was not suitable for its purposes, and that HDSCC knew this. Not only did the contract contain no promise that the equipment would be suitable, it contained an explicit disclaimer stating that HDSCC did *not* promise that the equipment would be suitable. January 2012 Lease Agreement § 6.3.

Therefore, Precision's allegation that HDSCC knowingly induced it to lease unsuitable equipment does not relate to any obligation that HDSCC had under the relevant contract, and cannot be characterized as a violation of the implied covenant of good faith and fair dealing. Precision's claim for a violation of the implied covenant is dismissed.

### 5. *Conversion*

Precision also alleges a claim of conversion against HDSCC for the "several hundred thousand dollars" it paid to HDSCC as rent for the Schedule J equipment before concluding the transaction was fraudulent, and therefore that it did not owe any rent to HDSCC. Am. Third-Party Compl. ¶ 153.

One necessary element of conversion is that the plaintiff (in this case, Precision), must have a "possessory right or interest in the property" and that the defendant (in this case, HDSCC) must have "dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (2006). Precision attempts to fulfill these elements by alleging that "[a]s a result of the fraudulent nature of the [Schedule J] transaction, HDSCC acted without authorization in accepting and keeping the funds it received from Precision Discovery." Am. Third-Party Compl. ¶ 156. But this allegation assumes in a conclusory fashion that the facts alleged throughout the complaint do, if true, constitute fraudulent inducement or misrepresentation.

The Court has already found that Precision has failed to state any fraud claim against HDSCC. Aside from that rejected theory, Precision

25

has set forth no other basis to suggest that HDSCC acted improperly in accepting and retaining the rent that Precision paid for the Schedule J equipment. Therefore, Precision has failed to allege necessary elements of conversion, and its conversion claim against HDSCC must be dismissed pursuant to Rule 12(b)(6).

### 6. *Unjust Enrichment*

Finally, Precision claims that HDSCC has been unjustly enriched by the several hundred thousand dollars Precision already paid under the Schedule J agreement. Am. Third-Party Compl. ¶ 164. This claim, like the conversion and implied covenant claims, appears to be just another version of Precision's inadequately pled fraudulent inducement and misrepresentation claims.

The New York Court of Appeals has made clear that "unjust enrichment is not a catchall cause of action to be used when others fail." *Corsello v. Verizon New York, Inc.*, 18 N.Y. 3d 777, 790 (2012). More specifically, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Id.* Where a plaintiff alleges "actionable wrongs" against a defendant, "[t]o the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiff['s] other claims are defective, an unjust enrichment claim cannot remedy the defects." *Id.* at 791.

Here, the facts Precision alleges to support its unjust enrichment claim are virtually identical to those it alleges to support several of its other tort and breach of contract claims: HDSCC was paid for equipment that was not suitable for Precision's needs, and the installation certificate was falsely signed by a Precision employee although installation had not taken place. *See* Am. Third-Party Compl. ¶¶ 161-165.

An allegation of unjust enrichment cannot remedy the problems, explained above, with Precision's many theories as to why it was legally wronged in its agreement to the Schedule J contract. Because the unjust enrichment claim is duplicative, it must be dismissed.

## IV. Conclusion

For the foregoing reasons, the motions of Cold Creek and Hitachi Vantara to dismiss all third-party claims against them, and the motion of HDSCC to dismiss all counterclaims against it, are GRANTED.

Dated: New York, New York
September 7, 2018

SO ORDERED:

Sidney H. Stein, U.S.D.J.