**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
HITACHI DATA SYSTEMS CREDIT
CORPORATION,

        Plaintiff/Counterclaim-Defendant,

        v.

PRECISION DISCOVERY, INC., a New York
corporation, f/k/a PRECISION DISCOVERY, LLC,

        Defendant/Counterclaim-Plaintiff.

------------------------------------------------------------X
PRECISION DISCOVERY, INC., f/k/a
PRECISION DISCOVERY, LLC,

        Third-Party Plaintiff,

        v.

HITACHI DATA SYSTEMS and COLD CREEK
SOLUTIONS, INC.,

        Third-Party Defendants.

------------------------------------------------------------X

Civil Case No. 17-cv-06851 (SHS)

## AFFIDAVIT OF JASON PIPER

I, **Jason Piper**, being duly sworn, states as follows:

1. I am currently the Information Technology ("IT") Director of Precision Discovery, Inc. ("Precision"). The matters addressed below are all based on my personal knowledge.

2. I was hired in February 2016 as the Senior Infrastructure Engineer in Precision's IT Department. In that capacity, I had the opportunity to work closely with Howard Holton ("Holton"), Precision's former Chief Information Officer, who was my direct supervisor from February 2016 until March 2017.

3. In or around the Fall of 2016, Holton informed me that Paul Schwappach, the Founder and President of Cold Creek Solutions, Inc. ("Cold Creek" or "CC") had invited him and his wife to take part in a $10,000 shopping spree for alcohol. Mr. Schwappach had offered to pay for the alcohol that Holton and his wife purchased to celebrate the fact that Precision had closed an agreement with Hitachi Data Systems Credit Corporation ("HDSCC") and Cold Creek to lease the G1000 Virtual Storage Platform (the "G1000 Equipment") from HDSCC.

4. Although Holton invited me to join him and his wife on this shopping spree for alcohol, I refused his offer because I thought it was potentially unethical for us to celebrate what was supposed to be an arm's-length transaction with the vendor paying for our purchases.

5. I later saw that Ms. Holton had posted pictures of the alcohol, including expensive bottles of tequila, whiskey and wine, to her Facebook account before later deleting them.

6. I saw that this was not an isolated incident, as Holton repeatedly told me about having been treated to numerous extravagant "gifts" and meals from Cold Creek and Hitachi Data Systems ("HDS"). Specifically, Holton would openly comment to me and others in Precision's IT department that HDS and Cold Creek frequently took Holton out for meals to the extent that one of the restaurants they frequented, Bara Sushi, had named a sushi roll after Holton called the "Howard Roll." In fact, Holton stated that he was eating so many meals with Billy Metting, an HDS Salesperson, that he quickly blew through Mr. Metting's entire monthly allocated meal budget before the month was over.

7. Similarly, Holton was open about the fact that HDS and Cold Creek paid for Holton to attend several high-profile sporting events, including football and baseball games. I also saw on Facebook that Holton attended celebrity bowling events with the Denver Broncos, and heard from others that Cold Creek would bid on Holton's behalf on raffle items in which

Holton was interested at the celebrity bowling events. On one occasion, I went to Holton's home where he showed me his large collection of sports memorabilia, including signed Denver Broncos helmets. Based upon what I saw on Facebook and heard from others, it is became apparent that HDS and Cold Creek employees gave Holton much of this expensive sports memorabilia as "gifts."

8. I also saw photographs on Facebook and in Holton's corporate email of Holton and Cold Creek employees at an expensive out-of-state firearms shooting trip. Notably, Holton was the only Precision employee on the trip, with the rest appearing to be affiliated with Cold Creek.

9. Holton even told me that while he was working for Precision, he was also working as a contractor/consultant for Cold Creek. In fact, on one occasion, Holton actually brought me to a meeting where he was acting on behalf of Cold Creek. Although I initially believed that we were going to look at an encrypted email solution for Precision, I soon realized that the system being pitched was inappropriate for Precision's needs. When I asked Holton about this, he told me, "I do some consulting for Cold Creek."

10. When I asked Holton if his consulting for Cold Creek was a conflict of interest, he claimed that there was no conflict and he had no problem working for both companies. In fact, Holton once told me, "we can probably get you doing side work," but I declined because I believed it crossed a line and was a conflict of interest.

11. In addition, another Precision employee, David Tran, told me that an employee from Cold Creek informed him that Cold Creek had ordered business cards with Holton's name printed on them. However, Holton refused to use these business cards because he did not like the quality of the paper used for the cards.

### **The G1000 Transaction**

12. Holton repeatedly claimed that Precision was running out of, or had in fact run out of, available storage space and needed to spend significant money in upgrading its equipment. This was incorrect.

13. As part of his efforts to purportedly upgrade Precision's equipment, he decided to obtain the G1000 Equipment from HDS and Cold Creek, which he claimed was state of the art storage equipment. In reality, the G1000 Equipment was already borderline obsolete.

14. Before Precision entered into an agreement with HDS and Cold Creek for the G1000 Equipment, Holton told me that HDS was giving Precision Discovery the G1000 at no additional cost to Precision based on Holton's close ties to HDS. When I questioned this assertion, believing it to be unlikely based on my experience, Holton told me that I should not worry about it.

15. Further, because Holton was so secretive about his dealings with Cold Creek and HDS, neither I nor anyone else at Precision could look at the underlying documentation to confirm Holton's claims.

16. When the G1000 was ultimately delivered to Precision's data center in Colorado, it was sent to a general staging area, where it remained unplugged and unconnected to any other piece of equipment for 48 days.

17. After examining the amount of storage, I did not believe that the G1000 was even usable, as the G1000 did not even have adequate capacity to replace, Precision's existing IT storage, and could only fulfill a fraction of Precision's then-existing data storage needs. It therefore could not possibly handle Precision's current storage needs, let alone handle any increase in those needs that was likely in the future.

18. About 48 days after the G1000 Equipment was delivered, I took it out of the general staging area and moved it to Precision's private cage, where it would continue to be stored, because I did not think it was appropriate to leave the equipment in general storage.

19. We later learned from Jim Andrews, a former Field Engineer for Cold Creek, that HDS and Cold Creek knew that the G1000 equipment was not suitable for Precision and that they were aware that it would not be sufficient to meet Precision's current data storage needs.

20. Additionally, contrary to what Holton had claimed, I discovered that the G1000 equipment had not been given to Precision free of charge, but had instead been part of a lease agreement between HDSCC and Precision entered into by Holton, under which Precision would be paying HDSCC over $5 million over a four-year period.

21. I further learned that, contrary to Holton's representations, the G1000 Equipment was already obsolete by the time that Precision had received it, and that his earlier claims that Precision had exhausted its storage space were untrue. I believe that, by suggesting that Precision had exhausted its storage space, Holton was laying the groundwork to justify paying Cold Creek and HDS large sums of monies to purchase equipment that was neither necessary nor suitable for Precision's needs.

22. Once I learned about the lease, I reviewed the G1000 lease from HDSCC, as well as the quote from Cold Creek. This lease agreement pertaining to the G1000 Equipment was contained in a separate Schedule, Schedule J, to the lease agreement between Precision Discovery and HDSCC. A true and correct copy of this Schedule J is attached hereto as Exhibit A.

23. When I carefully reviewed the pricing in Schedule J, I discovered that HDS and Cold Creek themselves valued the equipment as being worth less than $1 million. Therefore, in

total, HDSCC was making over $4 million in phantom profits as a result of the services and unnecessary extras in the G1000 transaction.

24. I further learned that Holton had agreed to lease agreements that "rolled in" equipment from prior lease agreements. By way of example, if Precision leased equipment from HDSCC under agreements A, B and C, when Holton negotiated agreement D with HDSCC, he would often incorporate by reference agreements A, B and C, and the equipment provided for therein, in agreement D rather than negotiating the equipment to be rented in a new, standalone lease agreement. This is a highly uncommon practice that resulted in Precision being on the hook for equipment in agreements A, B and C for far longer than the initial lease agreement provided. A spreadsheet outlining the Lease Schedules between Precision and HDSCC, as well as the total amounts paid thereunder and information regarding "rolled over" equipment, is attached hereto as Exhibit B.

25. I also discovered by examining the G1000 and Precision's systems that HDS never even did a full, complete and accurate installation of the G1000, despite the fact such an installation was required to be performed by the HDS Professional Services Group. In fact, the HDS Professional Services Group was supposed to provide Precision with "As Built" documentation, attesting to the proper installation of the equipment. This was not done, and the G1000 was never used for any business purposes or even fully tested by Hitachi personnel, much less the HDS Processional Services Group.

26. Moreover, although the invoice from Cold Creek reflects payments for G1000 installation support, maintenance support and software, the G1000 was never actually completely installed, we were never trained how to use the G1000 equipment, and licenses necessary to run Precision's operations were never installed on the G1000 equipment. A true and correct copy of

6

the September 22, 2016 invoice for the G1000 equipment from Cold Creek is attached hereto as Exhibit C.

27. However, the HDS installation certificate had been falsely completed by Holton, as it incorrectly claimed that the equipment install had been completed when no such event had occurred. On the contrary, when Holton falsified the installation of the equipment, the G1000 equipment was still unplugged in the general storage area of the data center. Significantly, until Holton executed and returned the Installation Certificate, no one – including HDS and Cold Creek's salespeople – would be entitled to payment under the Lease Agreement. A true and correct copy of the Installation Certificate falsely stating that the installation date of the G1000 Equipment had taken place is attached as Exhibit D.

28. I am also aware of other expensive purchases of equipment and software that Holton acquired that had no business purpose whatsoever for Precision, including but not limited to the ExtraHop, the Spectra Tape Library and Black Pearl, and the NSX and vRealize software.

29. In addition, I am aware of the fact that Holton made many equipment purchases, utilizing Precision funds, that served no business purpose for Precision, including items that Holton brought to his personal residence and would utilize for his own personal purposes, such as a new television and several hard drives and personal computers.

30. I declare that the foregoing is true and accurate to the best of my knowledge under the penalty of perjury.

_____
Jason Piper

Sworn to before me on
June 30, 2018

_____
Notary Public
State of Colorado
Arapahoe County

DARLENE K HALL
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20044002097
MY COMMISSION EXPIRES 01/22/2020

7