UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HITACHI DATA SYSTEMS CREDIT CORPORATION,

                    Plaintiff,

v.

PRECISION DISCOVERY, INC.,

                    Defendant.

17-Cv-6851 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

This contract dispute centers on defendant Precision Discovery, Inc.'s ("Precision") failure to pay plaintiff Hitachi Data Systems Credit Corporation ("Hitachi") for leased data storage equipment. Because defendant was obligated to pay for the delivered equipment "come hell or high water" under the lease's terms, plaintiff is entitled to summary judgment.

## I. BACKGROUND

In January 2012, Hitachi and Precision entered into a lease ("Lease Agreement") for Precision to rent equipment. (Def.'s Local Civil Rule 56.1 Response and Counterstatement ("Def.'s 56.1") ¶ 1; Decl. of Leon Tagawa dated Jan. 22, 2019 ¶ 3; Ex. A to Tagawa Decl. ("Lease Agreement").) Under the Lease Agreement, vendors—Hitachi Vantara Corporation ("Hitachi Vantara") or third parties—would directly supply the equipment. (*Id.* §§ 2, 17.) The Lease Agreement also provided that the parties would outline the particular equipment and rental prices in subsequent lease schedules. (Def.'s 56.1 ¶ 3.) Those schedules constituted independent contracts and incorporated the terms of the original Lease Agreement. (*Id.*) Three of those terms are important to highlight.

First, the Lease Agreement specified that as the lessee, Precision's "obligations to pay all amounts due are absolute and unconditional and shall not be subject to any abatement, reduction, set off, defense, counterclaim, interruption, deferment or recoupment for any reason whatsoever." (Lease Agreement ¶ 5.) Such language forms a quintessential "hell or high water" clause—a provision in many equipment leases that obligates the lessee to "make payments regardless of defective performance on the part of the lessor, that is, 'come hell or high water.'" *ReliaStar Life Ins. Co. of N.Y. v. Home Depot U.S.A., Inc.*, 570 F.3d 513, 519 (2d Cir. 2009); *Wells Fargo Bank, N.A. v. BrooksAmerica Mortg. Corp.*, 419 F.3d 107, 110 (2d Cir. 2005); *see, e.g., ReliaStar*, 570 F.3d at 516; *Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*, 247 F. Supp. 2d 352, 360–61 (S.D.N.Y. 2002).

Second, the Lease Agreement expressly disclaimed any representations by the lessor, Hitachi:

> LESSOR HAS NOT MADE, AND DOES NOT HEREBY MAKE, ANY REPRESENTATION OR WARRANTY AS TO THE TITLE, MERCHANTABILITY, PERFORMANCE, CONDITION, QUALITY, DESCRIPTION, DURABILITY, FITNESS OR SUITABILITY FOR PURPOSE BY LESSEE OR ANY OTHER PERSON OF ANY OF THE EQUIPMENT, OR COMPLIANCE WITH REQUIREMENTS OF ANY GOVERNMENTAL BODY OF ANY EQUIPMENT IN ANY RESPECT, OR ANY OTHER REPRESENTATION OR WARRANTY WITH RESPECT TO THE EQUIPMENT. LESSEE LEASES THE EQUIPMENT 'AS-IS' AND ALL OTHER EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS AND WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OR CONDITION OF MERCHANTABILITY, DESIGN, CAPACITY, CONDITION OR SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT ARE EXCLUDED TO THE MAXIMUM EXTENT PERMITTED BY LAW.

(Lease Agreement § 6.3.)

The Lease Agreement also contained a standard merger clause: "This L[ease ]A[greement] and each Schedule are the entire agreement relating to the subject matter of such Schedule. All other oral or written communications, understandings, proposals, representations and warranties are by agreement, excluded and are of no force or effect (to the extent permitted at law)." (*Id.* § 16.3(j).)

At issue in this case is a lease schedule signed by the parties in September 2016: Lease Schedule J. (Def.'s 56.1 ¶ 5; Tagawa Decl. ¶ 7; Ex. B to Tagawa Decl., Ex. A to Aff. of Jason Piper dated June 30, 2018 ("Schedule J").) That schedule provided for the two-year rental of a piece of equipment known as the Virtual Storage Platform G1000, as well as Hitachi Content Platform Anywhere Product Sales and Brocade Platform Sales. (Def.'s 56.1 ¶ 9; Schedule J at 1–4.) In exchange for the leased equipment, Precision owed Hitachi $103,500 monthly. (*Id.* at 4.) Schedule J incorporated the terms of the Lease Agreement and contained its own integration clause: "LESSEE AGREES THAT THE SCHEDULE AND LEASE AGREEMENT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER OF THE LEASE." (*Id.* at 1, 4.)

Howard Holton, Precision's former Chief Information Officer (CIO), signed Schedule J on behalf of his employer. (*Id.* at 4; Piper Aff. ¶ 2.) Cold Creek Solutions, Inc. ("Cold Creek") sent an invoice to Hitachi for the equipment outlined in Schedule J. (Ex. C to Piper Aff.) In addition to prepaying the first and last months' rent, Precision made four

additional lease payments. (Def.'s 56.1 ¶ 19.) After March 2017, however, Precision stopped paying Hitachi. (*Id.* ¶¶ 19–20.)

Jason Piper, Precision's current Information Technology Director who previously worked directly under Holton (Piper Aff. ¶¶ 1–2), alleges the following: Precision discovered that Holton had been secretly working in concert with employees at Hitachi Vantara and Cold Creek. Despite Holton's claims that the G1000 was necessary to meet Precision's data storage needs, the equipment was wholly inadequate and outdated. (*Id.* ¶¶ 12–13, 17, 19, 21.) Holton had represented to his staff that the G1000 would be provided at no additional cost to Precision. (*Id.* ¶ 14.) But this too was inaccurate. (*Id.* ¶¶ 20, 23.) Other Precision employees lacked access to the documentation of their employer's dealings with these companies to dispute Holton's claims that the Schedule J equipment was necessary and free. (*Id.* ¶ 15.)

Holton engaged in such misconduct, Precision asserts, because of his improper relationships with employees at Hitachi Vantara and Cold Creek. These employees allegedly took Holton on lavish shopping sprees, dining out, high-profile sporting events, and a joint trip. (*Id.* ¶¶ 3–8.) Cold Creek even made Piper a consultant and provided him with business cards. (*Id.* ¶¶ 9–11.)

In September 2017, Hitachi sued Precision for breach of contract. Precision responded with counterclaims against Hitachi and third-party claims against Hitachi Vantara and Cold Creek—all of which the Court dismissed in September 2018. *Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc.*, 331 F. Supp. 3d 130 (S.D.N.Y. 2018) ("*Hitachi I*"). All that remained was Hitachi's original claim for breach of contract.

Immediately before the close of discovery, Hitachi moved for summary judgment. At first at Precision's, and later at both parties', request, the Court twice allowed additional time to complete discovery. Now before the Court are Hitachi's motion for summary judgment as well as its three motions to strike materials filed by Precision in opposition to plaintiff's summary judgment motion.

## II. LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of Precision as the non-moving party, there exists no genuine dispute as to any material fact. *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017). A fact is only material if it has the potential to impact the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 148 (2d Cir. 2017). The Court applies New York law, which the parties' briefs treat as controlling. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000); *see also Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016).

### III. MOTIONS TO STRIKE

Hitachi seeks to strike three documents filed by Precision in opposition to plaintiff's motion for summary judgment: two purported affidavits and defendant's response and counterstatement to plaintiff's 56.1 Statement. Pursuant to Rule 56(c)(2), the Court deems Hitachi's motions to strike objections to the admissibility of the three identified documents. *See* 2010 Advisory Comm. Note to Fed. R. Civ. P. 56(c)(2) ("There is no need to make a separate motion to strike.").

"Because evidence inadmissible at trial is insufficient to create a genuine dispute of material fact, the Court need not engage in" a separate line-by-line analysis of Hitachi's objections. *Codename Enters., Inc. v. Fremantlemedia N. Am., Inc.*, No. 16 Civ. 1267, 2018 WL 3407709, at *4 (S.D.N.Y. Jan. 12, 2018); *Mergers & Acquisition Servs., Inc. v. Eli Global, LLC*, No. 1:15-cv-3723, 2017 WL 1157132, at *16 (S.D.N.Y. Mar. 27, 2017). The Court has considered those objections when evaluating the evidence submitted in connection with the motion for summary judgment. While Hitachi's motions to strike are denied as a formal matter, the Court has not relied on—and in fact has disregarded—any evidence that was not supported or that would not be admissible at trial. *See Nodoushani v. S. Conn. State Univ.*, 507 F. App'x 79, 80 (2d Cir. 2013) (recognizing district courts' discretion to merely disregard, rather than strike, inadmissible portions of evidence at summary judgment); *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) (same).

### IV. MOTION FOR SUMMARY JUDGMENT

Hitachi believes Precision's duty to make lease payments was inescapable in light of the Lease Agreement's "hell or high water" clause. Again, that term specified that Precision's responsibility for "all amounts due are absolute and unconditional and shall not be subject to any . . . defense, . . . for any reason whatsoever." (Lease Agreement ¶ 5.) Courts have consistently found such clauses enforceable, unambiguous, and a basis for summary judgment. *See ReliaStar*, 570 F.3d at 519; *BrooksAmerica Mortg. Corp.*, 419 F.3d at 110; *see, e.g., id.*; *Xerox Corp. v. Graphic Mgmt. Servs. Inc.*, 959 F. Supp. 2d 311, 318 (W.D.N.Y. 2013); *Wells Fargo*, 247 F. Supp. 2d at 360–61; *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, Nos. 91 Civ. 1816, 93 Civ. 4135, 92 Civ. 5283, 1994 WL 673519, at *11–*12, *17 (S.D.N.Y. Dec. 1, 1994).

Moreover, the Lease Agreement's incorporation of the New York Uniform Commercial Code's "hell or high water" provision provides an independent basis for summary judgment. The parties agreed that the Lease Agreement would be treated as a "finance lease" under the UCC. (Lease Agreement § 16.3(m) ("Lessor and Lessee agree

that the Lease is a 'finance lease' as defined in Article 2A of the UCC . . . .").)[1] For such non-consumer finance leases, the UCC "extends the benefits of the classic 'hell or high water' clause." N.Y. U.C.C. Law § 2-A-407 Off. Cmt. § 1; *see id.* § 2-A-103(1)(e), (g) (defining consumer and finance leases). Pursuant to this "self-executing" section, "the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods." *Id.* § 2-A-407(1) & Off. Cmt. § 1. The lessee's obligations are "effective and enforceable between the parties" and are "not subject to cancellation, termination, modification, repudiation, excuse, or substitution without the consent of the party to whom the promise runs." *Id.* § 2-A-407(2)(a)–(b).

Defendant offers a two-part response. First, Precision contends that its contractual obligation to pay Hitachi never went into effect because the equipment leased in Schedule J was never installed. Second, Precision maintains that Holton's alleged collusion with Hitachi Vantara and Cold Creek amounts to fraud, which constitutes an exception to the otherwise enforceable "hell or high water" clause. Neither argument provides defendant the safe harbor it seeks.

### A. Precision Became Obligated to Make Lease Payments Even Though the Equipment Was Never Installed.

Precision first disputes that it ever "accepted" the G1000, thus never triggering its obligation to make lease payments per the contract. Under the Lease Agreement, Precision's "obligation to pay Rent" began on the "Rent Commencement Date," which was defined in relation to the "Installation Date." (Lease Agreement §§ 7.1, 17; *see also id.* § 1 (providing that the initial term of schedules "shall begin on the Installation Date").) In turn, "Installation Date" was defined as "the date the Equipment is installed at Lessee's site." (*Id.* § 17.) Precision was supposed to "examine the Equipment immediately upon delivery" and "execute an Installation Certificate on the date the Equipment [wa]s installed." (*Id.* § 4.) Alternatively, "[i]f an executed Installation Certificate [wa]s not delivered to Lessor on the date the Equipment [wa]s installed at the Equipment location, the Installation Date shall be deemed to be, and Lessee shall be deemed to have accepted the Equipment on such date Vendor makes the Equipment available to Lessee." (*Id.*) Precision maintains that because the equipment was never installed nor made available, there remains no "Installation Date" to trigger a "Rent Commencement Date."

Although Holton executed an Installation Certificate on September 21, 2016 (Ex. D to Piper Aff. at 3), Precision argues that this date cannot be deemed the Installation Date because the equipment was never actually installed. When the G1000 was delivered to

---

[1] Such consensus is sufficient for finance lease treatment, even if the contract would not have otherwise met the definition for finance leases. N.Y. U.C.C. Law § 2-A-103(1)(g) Off. Cmt.; *see Xerox Corp. v. JCTB Inc.*, No. 6:18-cv-06154, 2018 WL 5776423, at *5 (W.D.N.Y. Nov. 2, 2018); *Xerox*, 959 F. Supp. 2d at 318.

5

Precision's data center, "it was sent to a general staging area, where it remained unplugged and unconnected to any other piece of equipment for 48 days." (Piper Aff. ¶¶ 16, 18.) Despite being required to do so, Precision says, Hitachi Vantara never installed the G1000. (*Id.* ¶¶ 25—26.) Nevertheless, on September 21, Holton completed an Installation Certificate, suggesting an installation occurred. (*Id.* ¶ 27.) Yet the Installation Date Holton recorded was not September 21, as would be logical, but the *next* day: September 22, 2016. (*Id.* ¶ 27; Ex. D to Piper Aff. at 1.) In Precision's view, this evidence is sufficient to raise a question whether the G1000 was installed and whether September 22, 2016, could be considered an Installation Date that in turn would prompt a Rent Commencement Date.

Even accepting defendant's argument thus far, Precision overlooks the alternative approach to calculate an Installation Date: when the equipment was available to and accepted by Precision. (Lease Agreement § 4.) Consistent with the Lease Agreement's terms, the UCC makes the irrevocability of lessee's promises under the lease contingent on lessee's acceptance of the leased goods. N.Y. U.C.C. Law § 2-A-407(1). Precision contends that installation is key to availability and acceptance, citing the hypothetical example given in the UCC's Official Comment. *Id.* Off. Cmt. § 4 ("After installation by [goods manufacturer] and testing by [lessee], [lessee] accepts the goods by signing a certificate of delivery and acceptance, a copy of which is sent by [lessee] to [lessor] and [manufacturer].").

Yet, this explanatory example does not trump the UCC's clear definition for acceptance: "Acceptance of goods occurs after the lessee has had a reasonable opportunity to inspect the goods" and signifies or acts as if the goods are conforming or will be retained despite nonconformity, or fails to effectively reject the goods. N.Y. U.C.C. Law § 2-A-515(1)(a)–(b); *see Netrix Leasing, LLC v. K.S. Telecom, Inc.*, No. 00-CIV-3375, 2001 WL 228362, at *5 (S.D.N.Y. Mar. 7, 2001). "Rejection of goods is ineffective unless it is within a reasonable time after tender or delivery of the goods and the lessee seasonably notifies the lessor." N.Y. U.C.C. Law § 2-A-509(2); *see Netrix Leasing*, 2001 WL 228362, at *5.

Here, defendant retained the equipment and made lease payments for multiple months. The record does not reflect that Precision indicated to Hitachi that it would be rejecting the equipment, which defendant appears to still have on its premises. Precision does not point to a requirement in the Lease Agreement or Schedule J that the equipment was not considered "available" until installed. Thus, Precision's failure to reject the G1000 in a timely manner amounts to acceptance under the UCC. *See Netrix Leasing*, 2001 WL 228362, at *5 (finding that the lessee had accepted equipment, despite its complaints, where it never informed the lessor that it was rejecting the equipment, never attempted to return it, and fully paid some months' rent); *see also Direct Capital Corp. v. New ABI Inc.*,

6

13 Misc. 3d 1151, 1165 (Kings Cty. 2006) ("Having accepted and retained the equipment even to this day despite plaintiff's demands for possession, defendants are bound to the terms of the lease."). Regardless of whether the equipment was installed, Precision's inaction rendered it responsible for lease payments.

### B. Holton's Alleged Fraud Does Not Render the Lease Agreement Unenforceable Because Precision Disclaimed Reliance on *Any* Representations.

Precision's second argument to defeat summary judgment is that the contract is void and unenforceable because it was procured by Holton's fraudulent misconduct—allegedly accepting gifts, trips, meals, and outings from Hitachi Vantara and Cold Creek in exchange for equipment leases that lined their pockets but provided no benefit to Precision. Although a "hell or high water" clause—either included as an express contractual term or incorporated via the UCC—typically "becomes irrevocable and noncancelable and requires the lessee to make payments irrespective of any defects in performance," an exception to the clause's enforceability exists in the case of fraud. *Direct Capital Corp.*, 13 Misc. 3d at 1164; *accord Xerox*, 2018 WL 5776423, at *5; *see also* N.Y. U.C.C. Law § 2-A-407 Off. Cmt. § 5; *Sterling Nat'l Bank v. Chang*, 10 Misc. 3d 131(A), at *1 (1st Dep't Dec. 7, 2005).

Nevertheless, Precision's allegations of misconduct fail to raise a *material* factual dispute, because defendant's fraud-based defenses carry the same elements as its previously-dismissed counterclaims. In *Hitachi I*, the Court dismissed, *inter alia*, Precision's counterclaims for fraudulent inducement and fraudulent misrepresentation for failure to state claims. 331 F. Supp. 3d at 148–50. The Court noted that the elements of both fraud claims included the defrauded party's reliance on a false material representation. *Id.* at 148. Yet, the Lease Agreement expressly disclaimed the existence of "*ANY* REPRESENTATION OR WARRANTY AS TO THE . . . SUITABILITY FOR PURPOSE BY LESSEE . . . OR *ANY OTHER* REPRESENTATION OR WARRANTY WITH RESPECT TO THE EQUIPMENT." (Lease Agreement § 6.3 (emphasis added).) At the motion to dismiss stage, this contractual term precluded Precision from stating a fraud-based counterclaim. *Id.* at 148–49.

So too here, the Lease Agreement's specific disclaimer of reliance on representations—operating in conjunction with the Lease Agreement and Schedule J's merger clauses, which excluded any representations not in those two documents (Lease Agreement § 16.3(j); Schedule J at 4)—prevents Precision from proving a fraud defense. This is because fraud-based affirmative defenses similarly include defendant's reliance on a false representation as elements. *See, e.g.*, *720 Lex Acquisition LLC v. Guess? Retail, Inc.*, No. 09 Civ. 7199, 2011 WL 5039780, at *5 (S.D.N.Y. Oct. 21, 2011) (requiring as elements for a fraud in the inducement defense "a false representation of a material fact upon which the party seeking to avoid the contract justifiably relied to their detriment in

entering into the agreement"); *Woo v. Times Enter., Inc.*, No. 98 CIV. 9171, 2000 WL 297114, at *7 (S.D.N.Y. Mar. 22, 2000) ("One element of the affirmative defense of fraudulent inducement is that the defendant relied on the misrepresentation."); *see also Minuteman Press Int'l, Inc. v. Matthews*, 232 F. Supp. 2d 11, 17 (E.D.N.Y. 2002) (dismissing a corresponding affirmative defense along with defendant's fraudulent inducement counterclaim because "what is said as to counterclaims is equally applicable to the affirmative defenses").

Defendant argues that the analysis for its counterclaims meaningfully differs from the analysis for its defenses because only on the former does Precision carry the burden of proof. But "one who relies upon an affirmative defense to defeat an otherwise meritorious motion for summary judgment must adduce evidence which, viewed in the light most favorable to and drawing all reasonable inferences in favor of the non-moving party, would permit judgment for the non-moving party on the basis of that defense." *Frankel v. ICD Holdings S.A.*, 930 F. Supp. 54, 65 (S.D.N.Y. 1996). Although a plaintiff seeking summary judgment consistent with a "hell or high water" clause must show that a fraud defense fails as a matter of law, *Sterling Nat'l Bank v. Kings Manor Estates, LLC*, 9 Misc. 3d 1116(A), at *4 (N.Y. Cty. Oct. 6, 2005), Hitachi has done so. Numerous courts—in addition to *Hitachi I*—have held that fraud-based claims and defenses are barred by nearly identical "hell or high water" clauses and other contractual terms as are present here. *E.g., Xerox*, 959 F. Supp. 2d at 319; *Wells Fargo*, 247 F. Supp. 2d at 370–71; *Window Headquarters*, 1994 WL 673519, at *14.

In sum, the business committed itself to making lease payments without exception.

## V. CONCLUSION

Because the Lease Agreement's terms operate to require Precision's payments under any and all circumstances, Hitachi's motion for summary judgment is granted. The parties are directed to confer regarding the amount of damages and to submit a proposed judgment by September 13, 2019.

Dated: New York, New York
August 13, 2019

SO ORDERED:

Sidney H. Stein, U.S.D.J.

8